UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON


KEITH W.R. LOWE,

      Plaintiff,

v.                         Civil Action No. 2:22-cv-00434

SUPERINTENDENT DONALD AMES
and MAJOR RICHARD TONEY,

      Defendants.


<u>MEMORANDUM OPINION AND ORDER</u>


      Pending is defendants Donald Ames and Richard Toney's Motion to Dismiss Second Amended Complaint. <u>See</u> ECF No. 40. Plaintiff timely responded in opposition, <u>see</u> ECF No. 42, to which defendants timely replied, <u>see</u> ECF No. 46. The motion is fully briefed.


I.   Background


a.   Factual Background


      The following allegations are drawn from the plaintiff's Second Amended Complaint, ECF No. 39 ("Sec. Am. Compl."), and are regarded as true for the purposes of the motion to dismiss.

At all times relevant to this matter, plaintiff Keith W.R. Lowe ("plaintiff" or "Lowe") was a detainee incarcerated at Mt. Olive Correctional Complex ("MOCC") in Fayette County, West Virginia, and under the custody of the West Virginia Department of Corrections and Rehabilitation ("WVDCR").  Sec. Am. Compl. ¶ 2, 3.  Defendant Donald Ames ("Ames") was, at all times relevant herein, the Superintendent of MOCC, "tasked by law with the care and custody" of all detainees at MOCC.  Id. ¶ 4.  Defendant Richard Toney was, at all relevant times herein, a captain employed at MOCC "responsible for the custody and care of incarcerated individuals."  Id. ¶ 5.

Throughout the spring and summer of 2020, the COVID-19 pandemic spread "through West Virginia to devastating effect." Id. ¶ 9.  By September 1, 2020, there had been 10,513 cumulative cases of COVID-19 in West Virginia and 224 West Virginians had died of the virus since reporting began on March 20, 2020.  Id. ¶¶ 52, 53.  On September 7, 2020, the "seven-day average"[1] for COVID-19 in West Virginia was 166 cases, 224 hospitalizations, and three deaths.

---

[1] "Seven-day average" means the average daily value of each statistic, calculated "by averaging the values of that day, the three days before, and the three next days." Coronavirus Resource Center: New COVID-19 Cases Worldwide, Johns Hopkins Univ. Med. (last visited Apr. 17, 2024).

The virus was also "virulent in carceral facilities across the state, again with devastating consequences." Id. ¶ 10. By "late summer 2020, COVID-19 was present in MOCC." Id. ¶ 11. On September 7, 2020, out of a population of 1,018 inmates, MOCC had 134 known active COVID-19 cases (i.e., approximately 13.16% of the population tested positive on September 7, 2020). Id. ¶ 56; see COVID-19 testing, W.Va. Division of Corrections and Rehabilitation, W. Va. Dep't Health & Hum. Servs. (Sept. 8, 2020), available at https://dhhr.wv.gov/COVID-19/Documents/COVID19_DCR_2020_09-07.pdf, (last accessed April 17, 2024) (displaying data from Sept. 7, 2020, across multiple WVDCR corrections facilities) (hereinafter, "WVDCR Sept. 7 Statistics").[2] "All positive inmates [were] placed in isolation." Id. Further, MOCC had 42 inmates in quarantine. Id. By September 7, 2020, two inmates at MOCC had died due to COVID-19. See Sec. Am. Compl. ¶ 57.

According to the WVDCR Sept. 7 Statistics, inmates in "quarantine" were those who were "[not] showing symptoms but [were] separated because they [were] new intakes, back from a hospital for unrelated reasons, etc." WVDCR Sept. 7 Statistics.

---

[2] The court may consider the WVDCR Sept. 7 Statistics at this stage because plaintiff cited it in his complaint, thereby incorporating it by reference. See, e.g., Epcon Homestead, LLC v. Town of Chapel Hill, 62 F.4th 882, 885 (4th Cir. 2023).

However, according to the second amended complaint, by late summer 2020, "Pod 6 on the Quilliams 2 (Q2) Unit [of MOCC] was being used as quarantine housing, where inmates who tested positive for COVID-19 were housed."[3]  Sec. Am. Compl. ¶ 12. Additionally, "[n]ew intakes to MOCC were also placed on Pod 6 for a 14-day quarantine."  Id. ¶ 13.  Prior to its use as a COVID-19 quarantine unit, "Pod 6 had been designated as a disciplinary unit."  Id. ¶ 14.

Pod 6 is a "row of cells enclosed by a glass wall running parallel to these cells," with approximately five feet of room between the cell doors and the glass wall.  Id. ¶ 15. Because of that arrangement, Pod 6 "is colloquially referred to as 'behind the glass.'"  Id.  By late summer 2020, it was "common knowledge that Pod 6 was being used as a quarantine unit" and that "some inmates housed 'behind the glass' had COVID-19."  Id. ¶ 16.

Prior to the events giving rise to this complaint, defendants Ames and Toney had been made "aware of the danger of placing . . . any inmate not positive for or suspected of having

_____

[3] Based off of the complaint's use of "quarantine housing" as a location that houses inmates who tested positive for COVID-19, the court, accepting as true the allegations made in the complaint for the purposes of this motion, will herein refer to quarantine housing as the same.

COVID" on Pod 6.  Id. ¶ 58.  In late August 2020, two new inmates, Terrel Davis and Robert Crabill III, arrived at MOCC and were quarantined on Pod 6, though they allegedly did not have COVID-19 at the time of their arrival.  Id. ¶ 59.  While on Pod 6, "both men contracted or were exposed to COVID" and filed grievances about their exposure to and contraction of the virus. Id. ¶¶ 61-63.  Crabill stated in his August 31, 2020, grievance that he had been tested upon his arrival at MOCC, and Davis stated in his September 1, 2020, grievance that he had been tested prior to his arrival at MOCC; both men stated that those tests were negative.  Id. ¶ 62-63.  Nonetheless, both men separately complained that upon their placement "behind the glass" (i.e., on Pod 6), they were exposed to other inmates who had COVID-19.  Id.

Crabill noted in his grievance, that he "did[ not] have [COVID-19] until [he] was placed behind the glass with other people who had it."  Id. ¶ 62.  On September 2, 2020, Captain Toney responded to Crabill's grievance by stating, "It is impossible for me to know when or where you contracted the virus.  MOCC is taking the necessary precautions to prevent the spread of the virus."  Id. ¶ 64.  The same day, he responded to Davis's grievance, stating, "All inmates arriving at MOCC are

quarantined for 2 weeks upon arrival.  All reasonable efforts are being made to prevent spread of the virus."  Id. ¶ 65.

On September 9, 2020, Toney again responded to Crabill's grievance, stating, "You caused yourself to be housed where you are due to your staff assault.  If you did not assault anyone . . . you would not have been housed there."[4]  Id. ¶ 66. On October 1 and 6, 2020, Toney responded to another, similar grievance filed by Davis, stating, "You arrived on quarantine from another facility. Your actions at ERJ[5] placed you in the cell you are in now.  The free public has and is exposed to persons that test positive for COVID."  Id. ¶ 67.

On September 7, 2020, plaintiff "allegedly tried to escape from the rec area in the Q2 unit," and he was taken to the "security wing for holding."  Id. ¶ 17.  While there, Toney informed plaintiff that "he was being moved to Pod 6."  Id. ¶ 18.  In response, plaintiff told Toney that he was negative for COVID-19 and that Toney could not house him in Pod 6 alongside "inmates who were on quarantine or were positive for COVID-19."  Id. ¶ 19.  Toney replied that the fact that

_____

[4] The complaint offered no context or further information regarding the "staff assault" referenced by Toney in his response to Crabill's grievance.
[5] The court suspects that this refers to WVDCR's Eastern Regional Jail, but the complaint provides no clarifying information.

6

plaintiff was negative for COVID-19 did not matter and that plaintiff "should have thought about that before [he] attempted to escape." Id. ¶ 20. Out of fear of exposure to and contraction of the virus, plaintiff pleaded with Toney to not place him "on the quarantine unit with individuals who had COVID-19." Id. ¶ 21. Toney then told Lowe that he would be placed behind the glass on Pod 6 "one way or another," whether "voluntar[ily] or involuntar[ily]." Id. ¶ 22.

Under Toney's orders and with defendant Ames's approval, "four officers physically moved [plaintiff] from the security wing to the COVID unit[6] on Pod 6." Id. ¶ 23. Because plaintiff was "forcefully relocated," the relocation was filmed "on a handheld video camera." Id. ¶ 24. While he was "being placed on Pod 6," plaintiff pointed out to the video camera operator that although "all the officers were dressed in personal protective equipment (PPE)" and masked, plaintiff "was not provided with a mask" or "any other protective gear." Id. ¶ 25. Plaintiff asked defendant Toney "numerous times for a

---

[6] Plaintiff refers several times to the "COVID unit" on Pod 6. Sec. Am. Compl. ¶ 23, 29, 32, 33, 46. It is unclear whether this phrase is intended to refer to all of Pod 6 (i.e., all of Pod 6 is the "COVID unit") or a portion of Pod 6 specifically designated as a "COVID unit" (separate from a new inmate quarantine unit) and to which plaintiff was relocated.

protective facemask," but Toney refused to provide one.  Id. ¶ 26.

At the time plaintiff was placed in his cell on Pod 6, it "had not been cleaned or sanitized": it was dirty, had "urine and feces in the toilet," and had "items belonging to the previous resident."  Id. ¶ 27.  Despite his requests, plaintiff was not provided with cleaning supplies.  Id. ¶ 28.

On or around September 10, 2020, approximately three days after his initial placement on the "COVID unit of Pod 6," plaintiff began to feel "very unwell."  Id. ¶ 29.  He experienced "extreme diarrhea" for days and "became completely unable to control his bowels," which resulted in him "defecating on himself multiple times."  Id.  He further "experienced severe body aches" and "suffered from an extreme headache" which made him feel "as though his skull was pounding in time with his heartbeat."  Id. ¶ 30.  He also experienced "pulmonary symptoms," feeling "as though he was unable to catch his breath" and experiencing "a large pressure in his chest" as though "someone was sitting on him."  Id. ¶ 31.  Plaintiff "fe[lt] as though he were dying."  Id. ¶ 32.  Based on the "combination of symptoms," plaintiff believed that he had contracted COVID-19 as a result of being "placed in the COVID unit."  ID.

On September 10, 2020, plaintiff filed a "sick call slip complaining about his diarrhea and troubles breathing" and a grievance about "Toney placing him on the COVID unit with inmates who had COVID." Id. ¶ 33.  The following day, plaintiff completed a "Unit Team Request Form stating, 'I am exhibiting symptoms of Covid-19, I have had diaraha [sic] all day again, and my bones and body are aching all over, I've had a pounding headache all day. I have literally begged Capt. Toney and medical personal [sic] to please give me a Covid-19 test.'" Id. ¶ 34.  On September 12, 2024, a nurse came to plaintiff's cell, and he informed her of his symptoms and asked to be tested for COVID-19.  See id. ¶¶ 34, 35.  However, the nurse "stated that [plaintiff] would not be tested, per [Toney's] orders" because Toney "had stated that [plaintiff] was not to be tested due to 'security reasons.'" Id. ¶ 36.  Over the next few days, plaintiff "continued to suffer from diarrhea and severe body aches." Id. ¶ 37.

On September 14, 2020, plaintiff filed another Unit Team Request Form, in which he stated, "Capt. Toney . . . you told me I wouldn't catch the [COVID] virus back here, now look at me. You made me sick . . . I've never been that sick in my life," and in which he requested of Toney, "[G]et medical down here and test me." Id. ¶ 38.  That same day, Toney did "a

walkthrough of Pod 6 with two members of the mental health staff," and plaintiff again asked Toney to allow him to be tested for COVID-19. Id. ¶ 39, 40. Toney "refused to provide [plaintiff] with access to medical staff or with a COVID-19 test," expressing that plaintiff had been tested on August 28, 2020, and did not need to be tested again. Id. ¶ 41. Toney made an additional statement "to the effect that" plaintiff was "'making a big deal out of nothing' and that he would feel better after 10 to 14 days." Id. Also on September 14, 2020, plaintiff filed a grievance related to being placed "on the COVID unit." Id. ¶ 46.

On September 15, 2020, Toney responded to plaintiff's Unit Team Request Form, stating "You placed yourself behind the glass due to your recent behavior. It's impossible to determine where you contracted the virus. You were tested on 28 Sept. 2020 [sic] you will not be tested again." Id. ¶ 42. Plaintiff notes that he was tested on August 28, 2020, and that Toney miswrote the date in this response. See id. n.1.

On or about September 16 or 17, 2020, Toney did another "walkthrough of Pod 6," during which plaintiff told him that he could not deny plaintiff medical treatment. Id. ¶ 43, 44. Toney replied by "stat[ing] that [plaintiff] was overreacting and making a big deal out of nothing," and told

10

plaintiff to "put in a call slip, which" Toney would personally take to medical staff.  Id. ¶ 44.  On or about September 16 or 17, plaintiff submitted another sick call slip.  Id. ¶ 45.

On September 20, 2020, plaintiff filed yet another grievance related to being placed "on the COVID unit."  Id. ¶ 46.  "[D]espite knowing that numerous inmates had contracted COVID-19 after being placed on Pod 6," defendants "maintained" plaintiff's placement thereon.  Id. ¶ 47.

After plaintiff's "presumed COVID-19 infection in September 2020," he has continued to "suffer from the symptoms of 'long COVID,' including but not limited to headaches, breathing problems, and brain fog.  Id. ¶ 48.  Anybody who contracts COVID-19 may experience long COVID, which is "broadly defined as signs, symptoms, and conditions that continue or develop after acute COVID-19 infection," and can "last weeks, months, or years" after infection.  Id. ¶ 49 (citing Long COVID or Post-COVID Conditions, Cent. for Disease Control and Prevention (July 20, 2023), available at https://www.cdc.gov/coronavirus/2019-ncov/long-term-effects/index.html (last visited Feb. 20, 2024).  Symptoms of long COVID can vary from person to person, but "the most commonly reported symptoms include fatigue, post-exertional

malaise, chest pain, brain fog, headaches, sleep problems,

diarrhea, and joint or muscle pain." Id. ¶ 51.

b.   Procedural History

On October 5, 2022, plaintiff, proceeding pro se,

filed his original complaint. See ECF No. 1. Pursuant to the

Southern District's Standing Order in Re: Assignment and

Referral of Civil Actions and Matters to Magistrate Judges, this

case was referred to the Magistrate Judge. See ECF No. 2. On

June 12, 2023, Plaintiff filed a Motion for Appointment of

Counsel. ECF No. 11. On July 20, 2023, defendants filed a

motion to dismiss, ECF No. 15, and plaintiff subsequently moved

to supplement his complaint, ECF No. 21, and responded in

opposition to defendants' motion, ECF No. 22. The court denied

without prejudice defendants' motion to dismiss. ECF No. 31.

On January 24, 2024, the Magistrate Judge granted

plaintiff's Motion for Appointment of Counsel, see ECF No. 32,

and appointed counsel for him. Because plaintiff was no longer

pro se, this case became no longer referred to the Magistrate

Judge.

On February 21, 2024, plaintiff, with leave of the

court, filed the Second Amended Complaint from which the

foregoing allegations are taken. See ECF No. 39 (Sec. Am.

12

Compl.).  Therein, pursuant to 42 U.S.C. § 1983, plaintiff
alleged one count of a violation of his Eighth Amendment right
to be free from cruel and unusual punishment when defendants
Toney and Ames, under the color of law, "acted with deliberate
indifference to a substantial risk of serious harm to Mr. Lowe's
health and safety."  Sec. Am. Compl. ¶ 71.  Plaintiff alleges
this violation occurred when defendants "intentionally housed
[plaintiff] on Pod 6 on the Q2 Unit for a non-medical or
epidemiological reason, despite knowing that Pod 6 was, at the
time, being used as a quarantine unit for those who were known
to or suspected of being exposed to or positive for the COVID-19
virus," and refused plaintiff's requests for masks or to be
tested for COVID-19  Id. ¶¶ 74, 75.  Plaintiff named each
defendant in his official capacity for the purposes of seeking
injunctive and declaratory relief, and he names each defendant
in his individual capacity for the purpose of seeking monetary
relief.  See id. ¶¶ 4, 5.

On March 6, 2024, defendants Ames and Toney jointly
filed the Motion to Dismiss Second Amended Complaint, ECF No. 40
(motion), 41 (memorandum of law) (hereinafter "Mot.").
Plaintiff responded in opposition, ECF No. 42 ("Resp."), to
which defendants have replied, ECF No. 46 ("Reply").

II.   Applicable Law

Rule 8(a)(2) of the Federal Rules of Civil Procedure requires a pleading to contain "a short and plain statement of the claim showing . . . entitle[ment] to relief."  Fed. R. Civ. P. 8(a)(2); Erickson v. Pardus, 551 U.S. 89, 93 (2007).  A party may test the sufficiency of a pleading by moving under Rule 12(b)(6) to dismiss it for "failure to state a claim upon which relief can be granted."  See Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555–58 (2006).

In order to defeat a 12(b)(6) motion, a complaint must contain "enough facts to state a claim that is plausible on its face."  Twombly, 550 U.S. at 570.  The court, at this early stage, "must accept as true all of the factual allegations contained in the complaint."  Erickson, 551 U.S. at 94 (citing Twombly, 550 U.S. at 555–56).  Further, all reasonable inferences are drawn in favor of the plaintiff.  E. I. du Pont de Nemours & Co. v. Kolon Indus., 637 F.3d 435, 440 (4th Cir. 2011) (citing Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250 (4th Cir. 2009)).  "Although for the purposes of a motion to dismiss we must take all of the factual allegations in the complaint as true, we are not bound to accept as true a legal conclusion couched as a factual allegation."  Iqbal, 556 U.S. at 678.

14

### III.   Discussion

Defendants make two arguments in their motion to dismiss.  <u>See</u> Mot. 4-6.  First, defendants argue that this suit must be dismissed because plaintiff's complaint was filed after the applicable statute of limitations expired.  Second, defendants argue that they are entitled to qualified immunity in this matter solely because plaintiff does not have a clearly established constitutional right "to be housed in any specific facility or any specific unit within any facility.

### a.   Statute of Limitations

Defendants first argue that plaintiff's complaint is barred by the statute of limitations because the West Virginia statute of limitations for § 1983 actions is two (2) years.  <u>See</u> Mot. 4; W. Va. Code § 55-2-12; <u>Owens v. Okure</u>, 488 U.S. 235, 249-50, 109 S. Ct. 573, 102 L. Ed. 2d 594 (1989) ("We accordingly hold that where state law provides multiple statutes of limitations for personal injury actions, courts considering § 1983 claims should borrow the general or residual statute for personal injury actions.").  Defendants assert that the complaint pleads only that plaintiff's claim accrued on September 10, 2020, and the statute of limitations "ran on, or before, September 10, 2022.  Mot. 4.  It is thus contended that

plaintiff's complaint, filed with the Clerk on October 5, 2022, is barred by the statute of limitations.

Plaintiff responds that, though plaintiff "believed, by September 10, 2020, that something was amiss," the complaint alleges "ongoing, continuing" violations of plaintiff's rights, invoking the "continuing violation" doctrine, under which the statute of limitations runs anew with each violation. See Resp. 6 (citing DePaola v. Clarke, 884 F.3d 481, 486 (4th Cir. 2018) ("[W]hen a harm has occurred more than once in a continuing series of acts or omissions, a plaintiff under certain circumstances may allege a 'continuing violation' for which the statute of limitations runs anew with each violation.")). In DePaola, the plaintiff alleged that prison officials had been deliberately indifferent to his medical needs where he experienced severe and continuous symptoms and prison officials were aware of his significant mental illnesses, "kept him continuously in solitary confinement," and "continue[d] to" withhold treatment even after two suicide attempts. DePaola v. Clarke, 884 F.3d 481, 484–85, 487 (4th Cir. 2018). The Fourth Circuit held that the "continuing violation" doctrine applied to § 1983 claims of deliberate indifference to serious medical needs, holding that, in order for the doctrine to apply, a plaintiff "must (1) identify a series of acts or omissions that

demonstrate deliberate indifference to his serious medical need(s); and (2) place one or more of these acts or omissions within the applicable statute of limitations for personal injury." Id. at 487. When the doctrine does apply, the applicable "statute of limitations runs anew with each violation." Id. at 486.

In their reply, defendants seek to distinguish DePaola from the present case, arguing that plaintiff here has failed to plead the required ongoing, continuous "deliberate indifference to a serious, ongoing medical need." DePaola, 884 F.3d at 487. Defendants argue that they "had no knowledge that Plaintiff was diagnosed with any medical condition and, further, it was not readily apparent that there was a serious risk of harm to [p]laintiff." Reply 3.

To determine the statute of limitations applicable to this § 1983 action, the court must "borrow the general or residual statute for personal injury actions" in West Virginia. Owens v. Okure, 488 U.S. 235, 249-50 (1989). In West Virginia, that statute provides for a two-year statute of limitations. W. Va. Code § 55-2-12. The parties appear to agree on this point.

Plaintiff contends that the "continuing violation" doctrine applies in this matter and that his original complaint was timely. Under the "continuing violation" doctrine, when

"defendants have violated and 'continue to' violate" a state inmate's rights, his § 1983 right of action accrues, and the statute of limitations begins anew, on the date of the latest allegation of constitutional injury. DePaola, 884 F.3d at 487-88 (citing Heard v. Sheahan, 253 F.3d 316 (7th Cir. 2001) (holding that "[e]very day" without treatment is a new violation)).

As defendants point out, the holding of DePaola only explicitly extends the "continuing violation" doctrine to claims under § 1983 that prison officials were deliberately indifferent to a prisoner's medical needs. Id. Defendants thus argue that its holding is inapposite in this case, where plaintiff has alleged "deliberate indifference to a substantial risk of serious harm," Sec. Am. Compl. ¶ 74, to his health and safety. See Mot. 4-5. The court is unpersuaded: language in DePaola suggests its holding should be read to apply to all claims under § 1983 alleging "deliberate indifference," not just those alleging deliberate indifference to medical needs, and the court arrived at its conclusion by relying on cases that use similarly broad language. DePaola, 884 F.3d at 486-88 (citing, among others, Siggers v. Campbell, 652 F.3d 681 (6th Cir. 2011) ("suggesting that prisoner may state claim if he shows "one, continuing harm and government indifference")). Accordingly,

the court finds that, under DePaola, the "continuing violation"
doctrine may apply to claims under § 1983 alleging deliberate
indifference to an inmate's medical needs or a serious risk to
an inmate's safety.

The first question is thus whether plaintiff has pled
a "series of acts or omissions that demonstrate deliberate
indifference" to a serious risk to his health and safety within
the limitations period. See DePaola, 884 F.3d at 487.  Prisoners
alleging "that they have been subjected to unconstitutional
conditions of confinement must" satisfy both an objective and a
subjective prong.  Scinto v. Stansberry, 841 F.3d 219, 225
(2016)

The objective prong requires the plaintiff to
"demonstrate that the deprivation alleged was, objectively,
sufficiently serious."  Id. (quoting Farmer v. Brennan, 511 U.S.
825, 834 (1994)).  "[T]o be 'sufficiently serious,' the
deprivation must be 'extreme' — meaning that it poses 'a serious
or significant physical or emotional injury resulting from the
challenged conditions,' or 'a substantial risk of such serious
harm resulting from . . . exposure to the challenged
conditions.'"  Id. (quoting De'Lonta v. Angelone, 330 F.3d 630,
634 (4th Cir. 2003)); see also Shakka v. Smith, 71 F.3d 162, 166
(4th Cir. 1995) (holding "a prisoner must produce evidence of a

19

serious or significant physical or emotional injury resulting from the challenged conditions or demonstrate a substantial risk of such serious harm resulting from the prisoner's unwilling exposure to the challenged conditions" (internal citations omitted)).

The subjective prong requires that the inmate allege that "prison officials acted with 'deliberate indifference.'" Porter v. Clarke, 923 F.3d 348 (4th Cir. 2019), as amended (May 6, 2019) (quoting Scinto, 841 F.3d at 225)). "To prove deliberate indifference, plaintiff[] must show that 'the official kn[ew] of and disregard[ed] an excessive risk to inmate health or safety.'" Id. (quoting Farmer, 511 U.S. at 837). "Deliberate indifference is 'more than mere negligence,' but 'less than acts or omissions [done] for the very purpose of causing harm or with knowledge that harm will result.'" Scinto, 841 F.3d at 225 (quoting Farmer, 511 U.S. at 835, 114 S.Ct. 1970). "Put differently, '[a]n obvious risk of harm justifies an inference that a prison official subjectively disregarded a substantial risk of serious harm to the inmate." Porter, 923 F.3d at 361 (quoting Schaub v. VonWald, 638 F.3d 905, 915 (8th Cir. 2011)).

Here, plaintiff has pled sufficient facts to preliminarily establish the objective prong of his claim.  He

has pled that the conditions he has challenged — the defendants'
intentional placement of plaintiff in a unit used as a COVID-19
quarantine ward when he was not suspected of having COVID-19 and
the refusal to provide him with a mask or testing — are
"sufficiently serious" inasmuch as they pose a "substantial risk
of serious harm" from potential infection and complications.
Scinto, 841 F.3d at 225; see Hallinan v. Scarantino, 466 F.
Supp. 3d 587, 604-05 (E.D.N.C. 2020) (finding conditions that
permit "a significant outbreak" of COVID-19 satisfy the
objective prong).  He has alleged the serious harms that
potentially befall persons infected with COVID-19, including
some symptoms associated with long COVID.  See Sec. Am. Compl. ¶
48-51.

     Plaintiff has further pled sufficient facts to allege
that defendants acted with deliberate indifference, satisfying
the subjective prong at this stage.  He has alleged that
defendant Toney "kn[ew] of and disregard[ed]" the risk that
placing plaintiff, who did not have COVID-19, behind the glass —
the COVID-19 quarantine portion of the prison — would lead to
plaintiff catching the virus.  Plaintiff has pled that prison
officials were aware of at least one inmate, Robert Crabill III,
who, in late August, had been negative for COVID-19 and then
developed COVID-19 sometime prior to August 31, 2020, only after

his placement behind the glass.  Sec. Am. Compl. ¶ 58-69.
Plaintiff has thus alleged that defendants were acutely aware of
that risk.  Further, plaintiff has pled that the virus had
befallen and indeed killed inmates at MOCC prior to his
placement behind the glass.  Id. ¶¶ 52-57.  Placing an inmate
who did not have the virus into the virus quarantine location is
"[a]n obvious risk of harm [that] justifies an inference that a
prison official subjectively disregarded a substantial risk of
serious harm to the inmate."  Porter, 923 F.3d at 361 (internal
quotations omitted).

        Accordingly, plaintiff has satisfied the first element
necessary to invoke the "continuing violation" doctrine by
establishing that placing him in the COVID-19 quarantine ward,
Pod 6 (i.e., "behind the glass"), is an action that was
deliberately indifferent to his health and safety, and thus
violative of his Eighth Amendment rights.

        The second question relevant to whether the
"continuing violation" doctrine applies here is whether
plaintiff has "place[d] one or more of [defendants'] acts or
omissions within the applicable statute of limitations for
personal injury."  DePaola, 884 F.3d at 487.

        Plaintiff's original complaint ("Og. Compl.") was
dated and signed by plaintiff as being September 28, 2022, see

22

Og. Compl. 13, and filed on October 5, 2022, and it is
undisputed that the Second Amended Complaint relates back to at
least October 5, 2022, and at most September 28, 2022.[7]  See
generally Mot., Resp.  The question is thus whether the Second
Amended Complaint alleges any continuing or ongoing deprivation
of plaintiff's Eighth Amendment rights that occurred after
September 28, 2020, or October 5, 2020 – two years prior to the
date the complaint was filed.  The answer is that it does not.

The Second Amended Complaint focuses on (1) the events
leading up to plaintiff's forced placement on September 7, 2020,
in Pod 6 ("behind the glass"), Sec. Am. Compl. ¶¶8-28, 52-57,
58-65; (2) the events involving plaintiff that transpired
between September 7, 2020, and September 20, 2020, id. ¶¶ 29-46;
and (3) plaintiff's long COVID symptoms, id. ¶ 48-51.

Even treating the complaint as filed on September 28,
2022, the complaint is fully devoid of any specific allegations
of actions or continued violations that occurred within the two-
year statute of limitations period.  The latest specific
allegation in the complaint that plaintiff was on Pod 6 is that

_____

[7] The parties offer limited discussion as to whether September
28, 2022, or October 5, 2022, is the date upon which the
complaint should be deemed filed, see Mot. 4-5; Pl. Resp. 8 n.5.
However, given the specifics of this case, the difference is
immaterial to the disposition of the pending motion.

he "filed two additional grievances related to being placed on the COVID unit on September 14 and September 20, 2020." Sec. Am. Compl. ¶ 46.  Inasmuch as that allegation references a violation that occurred more than two years before the complaint was filed, plaintiff has failed to establish that the violation alleged therein continued into the statute of limitations period.

Plaintiff contends that the complaint's allegation that defendants "maintained [plaintiff's] placement on Pod 6" is sufficient to establish a violation that occurred within the limitations period.  See Pl. Resp. 7-8.  Plaintiff notes that the date upon which he was removed from the COVID-19 unit is an issue of fact, not to be determined at the motion to dismiss stage.  Id.

While plaintiff is correct as to the procedural context, he must at least plead "enough facts to state a claim that is plausible on its face." Twombly, 550 U.S. at 570.  He has not done so here, where he has failed to "place one or more of [defendants' violations] within the statutory limitation period." DePaola, 884 F.3d at 487.  In DePaola, for example, the court held the continuing violations doctrine applied because plaintiff alleged present, ongoing, and current violations, specifically citing to present-tense verbiage in the

complaint.  See id. 487-88.  The plaintiff in DePaola had pled
that he had "'repeatedly' sought 'help'" for his "ongoing"
mental illness, that "defendants have violated and 'continue to'
violate his rights by failing to provide" treatment, and that he
"continues to" experience extreme symptoms.  Id. at 488.
Conversely, here, plaintiff's sole allegation that defendants
"maintained" him on Pod 6 is past tense, implies that he was at
some point removed from Pod 6, and does not provide any date on
which plaintiff was on Pod 6 inside the limitations period.

        Accordingly, even under the continuing violations
doctrine, plaintiff has failed to allege any violation within
the applicable statutory limitations period, and his complaint
is untimely.

              b.    Qualified Immunity

        Defendants assert that they are entitled to qualified
immunity inasmuch as "[p]laintiff has no [c]onstitutional right
to be housed in any specific facility or any specific unit
within any facility."  Mot. 5.  They cite to Sandin v. Conner,
515 U.S. 472, 482 (1995), for the contention that federal courts
must "afford appropriate deference" to "state officials trying
to manage a volatile environment," and to Hayes v. Thompson, 726

F.2d 1015, 1016-1017 (4th Cir. 1984), to argue that the
placement and assignment of inmates into particular units are
discretionary and not subject to review unless state or federal
law places limits on such discretion.  See also Curtis v.
Ozmint, 2011 WL 635302, at *8-9 (D.S.C. Jan. 5, 2011)
(collecting the above cases).  The court notes that all of these
cases relied upon by defendants are inapposite to this case.
Each of those cases deals with questions of whether moving an
inmate to a unit deprives them of due process under the
Fourteenth or Fifth Amendments; none of them address whether
such movement could constitute an Eighth Amendment violation in
a situation similar to the present case.

        Defendants contend that because prison officials
"believe[d] that [p]laintiff had been caught in an attempt to
escape" from his prior unit, "the decision was made to place
[p]laintiff on Pod 6" in order to "plac[e] another security door
between [p]laintiff and the general public."  Mot. 6.

        Plaintiff responds that defendants have failed to
argue that they are entitled to qualified immunity for the
violations of the Eighth Amendment actually alleged, inasmuch as
plaintiff's claim is that defendants were deliberately
indifferent by placing him in the COVID-19 quarantine unit while
he did not have the virus, not that defendants were deliberately

indifferent by simply placing him in a different unit.  Resp. 8-10.

Defendants reply by simply reiterating their argument that their decision to move plaintiff to Pod 6 was "discretionary" and valid "due to [p]laintiff (sic) high risk of harm and potential to escape."  Reply 4.  Defendants add that, "quite simply, the allegations of a continued exposure to Covid-19 are speculation at best and not something a reasonable person would know requires immediate medical attention."  Id.

Inasmuch as a qualified immunity defense is only applicable to a claim against an official in his or her individual capacity, this defense is inapplicable to plaintiff's claims for declaratory and injunctive relief against defendants in their official capacities.  See Wall v. Wade, 741 F.3d 492, 498 n.9 (4th Cir. 2014).

When a government official is sued in their individual capacity, they are shielded by qualified immunity "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  King v. Riley, 76 F.4th 259, 264-65 (4th Cir. 2023) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  "To overcome qualified immunity, a plaintiff must typically show (1) that the government official violated a statutory or

constitutional right and (2) that right was clearly established at the time of the challenged conduct." Id.

Beginning with the first prong, defendants' placement of plaintiff on Pod 6, previously a disciplinary unit that was now being used as a quarantine ward where inmates who tested positive for COVID-19 were housed, when plaintiff did not previously have COVID-19 or symptoms thereof was deliberately indifferent to a significant risk to his health and safety, and thus violative of his Eighth Amendment rights. See supra.

The court turns to whether the right was clearly established. "To start, it bears emphasizing that 'the lodestar for whether a right was clearly established is whether the law gave the officials 'fair warning' that their conduct was unconstitutional." Pfaller v. Amonette, 55 F.4th 436 (4th Cir. 2022) (quoting Iko v. Shreve, 535 F.3d 225, 238 (4th Cir. 2008)).

As defendants note, the court must define the right with specificity. See City and Cnty. of San Francisco, Calif. v. Sheehan, 575 U.S. 600, 613 (2015). The question of whether a right was clearly established examines not whether "the very action in question has previously been held unlawful," but whether, "in light of pre-existing law[,] the unlawfulness" was "apparent." Wilson v. Layne, 526 U.S. 603, 615 (2009).

"To determine if a constitutional right was clearly established," the court must examine "controlling authority," which includes "the decisions of the Supreme Court, [the Fourth Circuit], and the highest court of the state in which the case arose." <u>Dean for & on behalf of Harkness v. McKinney</u>, 976 F.3d 407 (4th Cir. 2020) (quoting <u>Owens ex rel. Owens v. Lott</u>, 372 F.3d 267, 279 (4th Cir. 2004)). "If 'there are no such decisions from courts of controlling authority, we may look to a consensus of cases of persuasive authority from other jurisdictions if such exists.'" <u>Id.</u> (quoting <u>Booker v. S.C. Dep't of Corr.</u>, 855 F.3d 533, 538-39 (4th Cir. 2017) (internal quotations omitted)). However, "[t]hat there is little precedent imposing liability under these specific circumstances does not necessarily mean that an officer lacks notice that his conduct is unlawful." <u>Id.</u> (citing <u>Browder v. City of Albuquerque</u>, 787 F.3d 1076 (10th Cir. 2015) ("[S]ome things are so obviously unlawful that they don't require detailed explanation and sometimes the most obviously unlawful things happen so rarely that a case on point is itself an unusual thing.").

With this framework in mind, the court must determine here whether it was clearly established that plaintiff had a right to not be placed and then kept in the disciplinary portion

of the prison that was being used as a quarantine ward for newly admitted inmates and those afflicted with COVID-19 — then a novel and potentially deadly pathogenic virus — when he was previously not infected but had attempted to escape from the prison's recreational area.  The court finds that in September of 2020, which is alleged by plaintiff as "early in the pandemic," Sec. Am. Compl. ¶ 52, that right was clearly established.

As an initial matter, neither any federal court nor the Supreme Court of Appeals of West Virginia had, prior to September 2020, ruled directly that an inmate has a right to not be placed in a cell or unit wherein prison officials know others have COVID-19.  However, four circuit courts of appeals have analyzed whether qualified immunity protects a prison official who is deliberately indifferent by exposing an inmate who did not have COVID-19 to inmates that did.  Three of those circuits — the Second, Sixth, and Ninth — found that qualified immunity did not apply, and the fourth — the Tenth Circuit — found that qualified immunity did apply, but only because the plaintiff failed to establish deliberate indifference (in other words, the Tenth Circuit did not address whether the right was clearly established).  See Nazario v. Thibeault, No. 22-1657, 2023 WL 7147386 (2d Cir. Oct. 31, 2023); Gordon v. Burt, No. 23-1775,

30

2024 WL 1842873 (6th Cir. Apr. 24, 2024); Hampton v. California,
83 F.4th 754 (9th Cir. 2023), cert. denied sub nom. Diaz v.
Polanco, No. 23-722, 2024 WL 2116277 (U.S. May 13, 2024);
Anderson v. Long, No. 23-1050, 2023 WL 8543932 (10th Cir. Dec.
11, 2023), cert. denied, 144 S. Ct. 1377 (2024).  Of the three
circuit courts that have analyzed whether the right was clearly
established, all three have found that it was.

    In Nazario, the Second Circuit analyzed an Eighth
Amendment claim of deliberate indifference to plaintiff's
medical needs.[8]  2022 WL at *2.  As relevant, "at the beginning
of April" of 2020, prison officials forced the plaintiff-inmate
to move into E-Block, a set of cells that "had no windows and
had bar doors that were open to the hallway" and which defendant
knew housed "inmates that [] were COVID-19 positive and
symptomatic."  Nazario v. Thibeault, No. 3:21-CV-216-VLB, 2022
WL 2358504, at *2 (D. Conn. June 30, 2022), aff'd, No. 22-1657,
2023 WL 7147386 (2d Cir. Oct. 31, 2023); see Nazario v.
Thibeault, No. 22-1657, 2023 WL 7147386, at *1 (2d Cir. Oct. 31,
2023) ("We assume the parties' familiarity with the underlying

---

[8] Though the Second Circuit on appeal analyzed this case as a
medical needs question, the district court's decision denying
qualified immunity did so on the basis of serious risk to the
inmate's health and safety.  See Nazario v. Thibeault, No. 3:21-
CV-216-VLB, 2022 WL 2358504, at *8 (D. Conn. June 30, 2022),
aff'd, No. 22-1657, 2023 WL 7147386 (2d Cir. Oct. 31, 2023).

facts, the procedural history of the case, and the issues on
appeal.").

        The Second Circuit held that defendant was not
entitled to qualified immunity because he failed to follow
Department of Correction policies, "including policies regarding
the quarantine of inmates with Covid-19 housed in E-Block";
failed to provide plaintiff proper protective equipment for his
laundry job; and "knew of Covid-19 positive and/or symptomatic
inmates in E-Block and disregarded the risk associated with
[plaintiff's] transfer there."  2023 WL, at *2.  The Second
Circuit based this holding on Helling v. McKinney, 509 U.S. 25,
33 (1993), wherein the Supreme Court held that prison officials
may not "be deliberately indifferent to the exposure of inmates
to a serious, communicable disease" based on the lack of present
symptoms.  Id.; see also Jolly v. Coughlin, 76 F.3d 468, 477 (2d
Cir. 1996) (recognizing "correctional officials have an
affirmative obligation to protect inmates from infectious
disease"); Lareau v. Manson, 651 F.2d 96, 109 (2d Cir. 1981)
(holding that the failure to adequately screen newly arrived
inmates for communicable diseases would violate the Eighth
Amendment "since it represents an '(omission) sufficiently
harmful to evidence deliberate indifference to serious medical
needs'" (quoting Estelle, 429 U.S. at 106)).

In Helling v. McKinney, a prisoner was assigned to a
cell with an inmate who smoked five cigarette packs per day.
509 U.S. at 36.  The court held that the prisoner stated a valid
"conditions of confinement" claim under the Eighth Amendment due
to prison official's deliberate indifference to an unreasonably
high amount of environmental tobacco smoke, posing an
unreasonable risk of serious damage to his future health.  509
U.S. at 35.  In so finding, the court relied on dicta that
""infectious maladies such as hepatitis and venereal
disease . . . was one of the prison conditions for which the
Eighth Amendment required a remedy," and that prison officials
may not "be deliberately indifferent to the exposure of inmates
to a serious, communicable disease on the ground that the
complaining inmate shows no serious current symptoms."  Id. at
32 (citing Hutto v. Finney, 437 U.S. 678, 682 (1978), abrogated
on other grounds by Dep't of Agric. Rural Dev. Rural Hous. Serv.
v. Kirtz, 601 U.S. 42 (2024)).

In Gordon, the Sixth Circuit analyzed an Eighth
Amendment claim of deliberate indifference to risk of harm where
defendant prison officials on July 27, 2020, moved inmates, who
had close contact with an inmate who had tested positive for
COVID-19, to the plaintiff's unit.  See Gordon v. Burt, No.
1:21-CV-415, 2023 WL 4409200 (W.D. Mich. May 3, 2023), report

and recommendation adopted, No. 1:21-CV-415, 2023 WL 3914934
(W.D. Mich. June 9, 2023), vacated and remanded, No. 23-1775,
2024 WL 1842873 (6th Cir. Apr. 24, 2024). Plaintiff alleged
that defendants "failed to isolate the close-contact prisoners
from the non-close-contact prisoners who already resided [in
plaintiff's unit]" and that the close-contact prisoners were
allowed to access the same areas as the non-close-contact
prisoners. Id.

Like the Second Circuit, the court relied on Helling
to find that "a reasonable prison official would have understood
that she could not exhibit deliberate indifference to the risk
to inmate safety presented by the COVID-19 pandemic" and that
"purposefully commingling infected prisoners with uninfected
prisoners" violated the Eighth Amendment. Gordon, 2024 WL, at
*3 (6th Cir. Apr. 24, 2024).

In Hampton, the Ninth Circuit reviewed an Eighth
Amendment allegation of deliberate indifference to a substantial
risk of serious harm to an inmate. Hampton, 83 F.4th at 765-66.
There, prison officials had been made aware that transfers
between prisons "carr[y] [a] significant risk of spreading
transmission of [COVID] between institutions" and of the
significant risk of the virus. Id. at 759. Nonetheless, prison
officials transferred 122 inmates on May 30, 2020, from one

prison to another, some of whom exhibited symptoms and "most of" whom "had not been tested for COVID-19 for over three weeks," and "instead of quarantining the inmates upon their arrival" at the receiving prison, defendants had them share space and equipment with other inmates at the receiving prison.  Id.  The plaintiff was the surviving spouse of an inmate who was already at the receiving prison, became ill with COVID-19 after the transfer, and died.

The Ninth Circuit found that defendants' actions violated the Eighth Amendment, and further found that defendants were not entitled to qualified immunity.  Id. at 769.  Stating that the plaintiff was "not required to point to a prior case holding that prison officials can violate the Eighth Amendment by transferring inmates from one prison to another during a global pandemic," the court relied on Helling in holding that it was clearly established that "[t]he Eighth Amendment requires [prison officials] to reasonably protect inmates from exposure to serious diseases."  Id. at 770.  The court then relied on Ninth Circuit precedent to find that Helling's broad prohibition on such conduct was properly applied to the specifics of the COVID-19 pandemic.  Id.

As the Ninth Circuit did in Hampton, the Fourth Circuit has similarly applied broadly worded protections against

cruel and unusual punishment to determine whether qualified immunity precluded claims of deliberate indifference.  See Pfaller, 55 F.4th at 454-56; Mays v. Sprinkle, 992 F.3d 295, 301-02 (4th Cir. 2021).  In Pfaller, for example, the court found that the Eighth Amendment's broad prohibition of deliberate indifference to a prisoner's serious medical needs was clearly established in finding that a prison doctor who knew of but did not act upon a prisoner's hepatitis C diagnosis was not entitled to qualified immunity.  Pfaller, 55 F.4th at 454.  There, the court explicitly rejected the doctor's contention that his actions must be analyzed by specifically determining whether it was clearly established that his denial of a "specific type of follow-up test" for the patient's diagnosis violated the Eighth Amendment.  Id. at 453 (citing Hope v. Pelzer, 536 U.S. 730, 739 (2002) (declining to inquire whether "the very action in question has previously been held" to violate the Eighth Amendment and rejecting qualified immunity because "the risk of harm is obvious").  Instead, the court found that the broad Eighth Amendment standard — that a prisoner has a right to be free from deliberate indifference to his serious medical needs — was clearly established, and thus that the doctor "was on notice that he could not refuse necessary medical care to" the prisoner.  Id. at 453.

In <u>Anderson</u>, the Tenth Circuit found that prison officials who "fail[ed] to implement a policy of providing single-person prison cells to medically vulnerable inmates" were entitled to qualified immunity.  2023 WL, at *2.  The court based this decision purely on plaintiff's failure to establish a constitutional violation — it did not reach the question of whether any such right was clearly established.  <u>Id.</u>

Here, the complaint alleges that by September 7, 2020, prison officials were well aware of the "serious, communicable" nature of COVID-19 and of the risk that it posed if contracted by inmates, including plaintiff.  As the Fourth Circuit did in <u>Pfaller</u>, the court analyzes whether the Eighth Amendment's broad protections for prisoners against deliberate indifference to their health and safety was clearly established in the context of dangerous, highly contagious diseases.  The circuit courts which have addressed a nearly identical question respecting COVID-19 have found, under <u>Helling</u>, it was clearly established as of September 7, 2020.  Defendants in this case were thus on notice that it was impermissible to deliberately expose an inmate, whom they knew to be otherwise uninfected, to COVID-19.

Though defendants in this matter placed plaintiff "behind the glass" allegedly due to security considerations rather than on the premise "that the complaining inmate shows no

37

serious current symptoms," it was nonetheless clearly established under <u>Helling</u> that purposefully and knowingly exposing an otherwise healthy inmate to a "serious, communicable," and deadly disease constituted deliberate indifference.  <u>Helling</u>, 509 U.S. at 32.

Accordingly, because it was clearly established that plaintiff had a right to be free from deliberate indifference to the substantial risk of harm to his health allegedly caused by defendants knowingly exposing him to inmates who are positive for COVID-19, plaintiff has adequately alleged that defendants are not shielded by qualified immunity.

## IV. Conclusion

For the foregoing reasons, the court finds that, though defendants are not entitled to qualified immunity, plaintiff has failed to state a claim upon which relief can be granted by virtue of the applicable statute of limitations. Accordingly, the court GRANTS defendants' motion to dismiss and ORDERS that this case be DISMISSED from the docket.

The Clerk is directed to transmit copies of this order to all counsel of record and to any unrepresented parties.

ENTER: June 28, 2024

John T. Copenhaver, Jr.
Senior United States District Judge