UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

KEITH W.R. LOWE,

      Plaintiff,

v.                            Civil Action No. 2:22-cv-000434

SUPERINTENDENT DONALD AMES
and MAJOR RICHARD TONEY,

      Defendants.


<u>MEMORANDUM OPINION AND ORDER</u>


      Pending are Plaintiff's Motion for Summary Judgment, (ECF No. 86), filed with an accompanying memorandum of law, (ECF No. 87); and Defendants' Motion for Summary Judgment, (ECF No. 88), filed with an accompanying memorandum of law, (ECF No. 89), all filed on February 20, 2025.  <u>See</u> ECF Nos. 86-89.

      Defendants and plaintiff filed responses to the opposing motions on March 6, 2025.  ECF Nos. 92, 93.  Plaintiff and defendants filed replies to the responses on March 13, 2025.  ECF Nos. 96, 97.


          I.    <u>BACKGROUND</u>


      A. Factual History

      Plaintiff Keith W.R. Lowe ("plaintiff") was, at all relevant times herein, a prisoner at Mt. Olive Correctional

1

Complex ("MOCC") in Fayette County, West Virginia, which is under the custody of the West Virginia Department of Corrections and Rehabilitation ("WVDCR").  Pl.'s Mem. Supp., ECF No. 87, at 2.  At all relevant times herein, Defendant Donald Ames ("Ames") was the Superintendent of MOCC, and defendant Richard Toney ("Toney") was a correctional officer with the rank of captain, employed at MOCC.[1]  Defs.' Mem. Supp., ECF No. 89 at 1.

This case, filed <u>pro</u> <u>se</u> by plaintiff on October 5, 2022, arises from plaintiff's alleged mistreatment by the defendant prison officials in the 2020 to 2021 period during the SARS-CoV2 virus ("COVID-19") pandemic.  <u>See</u> Third Am. Compl., ECF No. 68.  Plaintiff has sued the defendants in both their official and their individual capacities and requests compensatory damages, including attorney fees and costs, punitive damages, and injunctive and declaratory relief.  <u>Id.</u> at 12-13.

The parties agree that the COVID-19 pandemic occurred in 2020 and was in effect at all relevant times herein.  Pl.'s Mem. Supp. at 2; Defs.' Mem. Supp. at 2.  In September of 2020,

---

[1] Defendant Toney stated that he held the rank of captain for "about four and a half years" before he earned the rank of major "about three and a half, four years" before his deposition which was taken on January 30, 2025.  Toney Dep. at 16:1-9.

2

MOCC "had a high concentration of COVID-19, with over 134 active cases and a further 42 people in quarantine."  See Preliminary Declaration Regarding COVID-19 Quarantine Procedures, William Weber, MD, Jan. 15, 2025, ECF No. 86-1 ("Dr. Weber Report") at 2.  In July 2020, there were two deaths related to COVID-19 at MOCC.  Id. n. 4.  MOCC would see four additional deaths related to COVID-19 in September 2020, followed by another two in October 2020.  See id. (citing report from West Virginia Department of Health and Human Resources, Inmate deaths confirmed or possibly related to COVID-19 as of February 9, 2022).

On September 7, 2020, plaintiff attempted to escape from MOCC.  See Lowe Dep., ECF No. 88-7 at 22:18-24, 23:1-15; 85:22-23.  Maintaining that he was "consumed" by paranoid schizophrenia, which led him to believe he "was going to be killed" if he did not leave MOCC, plaintiff "tried to cut a hole in the fence in the rec yard to escape."  Id. at 22:18-23.

This was, in fact, plaintiff's third attempt to escape MOCC.  In addition to his 2020 escape attempt,[2] he had previously

---

[2] Plaintiff's counsel indicates that plaintiff "allegedly" attempted to escape from prison.  Id. at ¶ 17.  However, plaintiff admitted in his deposition that he attempted to escape when he volunteered, "Yeah, I tried to escape."  Lowe Dep., ECF No. 88-7 at 85:22-23.  Accordingly, the court accepts his admission and removes any reference to the escape as "alleged."

attempted to escape in 2007 and 2012.  Id. at 21:1-23.  To
effectuate both his escape attempts in 2012 and in 2020,
plaintiff created and placed a dummy in his bed "to pass count."
Id. at 22:2-7; Toney Dep. Tr., ECF No. 88-6 at 49:1-14.

Defendant Toney testified that because the rec yard
contains "a pretty robust barbed wire system" and "a fence you
have to cut," and because inmates are "strip-searched to come
out of their cell," defendant Toney "didn't think it was
possible" for someone to attempt to escape from the Quilliams 2
rec yard — it was something he "never anticipated."  Id. at
45:17-24, 46:1-7.  Moreover, the dummy plaintiff had
constructed, in addition to plaintiff's disciplinary reports
detailing a repeated history of possessing contraband,[3] gave
defendant Toney pause.  "Just with the history and things that
had happened in the past, I didn't know.  Did he have help?  Did

---

[3] The record contains disciplinary reports against plaintiff for
"Hate/Gang Activity," "Possession of Weapons (Edged Weapons),"
"Contraband," and "Escape," with one report dated June 30, 2017,
two reports dated July 6, 2017, and two reports dated July 12,
2017.  See Disciplinary Incident Reports, ECF No. 88-8.  A
document entitled "Evidence/ Property Seizure Report," dated
July 6, 2017, shows that contraband including a "CRKT folding
knife, silver/gray in color, approximately 6-inch length" was
discovered hidden "in a bottle of Velveeta cheese" in
plaintiff's "cell/bunk" during a search.  Id.  Another evidence
report, also dated July 6, 2017, describes that a "bit driver"
was discovered in plaintiff's cell.  Id.  Photos of the
described contraband are also contained in the record.  Id.

he have assistance?" Id. at 46:15-16. Defendant Toney testified that, following plaintiff's escape attempt on September 7, 2020, he "wanted [plaintiff] in the most secure place I could put him, and that was where he went was behind the glass." Id. at 46:16-18.

Quilliams is a higher-security unit within MOCC commonly referred to by inmates and prison officials as "Q." See Ames Dep., ECF No. 88-5 at 45:23-24, 46:1-8. The Q unit is a two-story unit lined with individual cells where inmates are housed individually, and the floors are referred to as "Q-1" and "Q-2." Id. at 45:23-24, 47:16-24. Each floor contains one shower, which the inmates share. Id. at 82:18-24. The Q unit as a whole is a higher-security portion of MOCC. Id. at 48:2-18. Pod 6 is "a more secured area within the Quilliams 2 Unit[,]" because "for an officer to enter into that unit, from going into the front door to go into the inmate's cell, you're going through a series of three doors," the second of which is a "door to go in behind the glass unit." Id. at 49:3-11. For this reason, the Pod 6 section of Q-2 is commonly known as "behind the glass." Id. at 48:22-24; Lowe Dep., ECF No. 88-7 at 23:2-6, 24:4-18.

Each cell in Pod 6 contains its own individual toilet and sink, and inmates are escorted to and from their cells only

with correctional officer escorts, including to take showers.
See Ames Dep., ECF No. 88-5 at 49:2-11, 51:1-52:24.  Defendant
Ames testified that inmates "can't go to the shower by
themselves — they have to be physically taken[.]"  Id. at 52:23-
24.  Pod 6 was used as a disciplinary unit both before and
during the COVID-19 pandemic.  Id. at 50:13-24, 51:21-24, 52:1-
15.  During the COVID-19 pandemic, the Q-2 Unit as a whole was
being used to quarantine, for 14 days, new inmates who were
transferred to MOCC for disciplinary violations at other
facilities.  Id. at 50:23-24, 51:1-13.  Additionally, Captain
Toney testified that inmates within the Quilliams Unit who
tested positive for COVID-19 were, at some unspecified point
early in the pandemic, taken to Pod 6 for isolation.  See Toney
Dep., ECF No. 88-6 at 38:14-20.  Superintendent Ames "can't
remember if that's what we did or not," but stated that "it's
possible."  Ames Dep. at 87:10-14.  Plaintiff, who was behind
the glass as of September 7, 2020, appears to have been there in
Pod 6 with at least one inmate in Quilliams who tested positive
for COVID-19 and was moved to Pod 6 for isolation.  See
Grievance of Brandon Long, ECF No. 86-7 at 4 ("On Friday August
28th [2020] I was tested for COVID-19 and on Sunday August 30th
[2020] the C.O. come to my cell (Q1-601) and told me I tested
positive and had to be moved to quarantine on Q2-604 behind the
glass.").

6

Over plaintiff's alleged protest, the parties agree that plaintiff was "physically moved from the security wing to Pod 6." Defs.' Answer to Third Am. Compl. ¶ 23. The parties also agree that "[b]ecause Mr. Lowe was being forcefully relocated, his move from the security wing to Pod 6 was filmed on a handheld video camera." Third Am. Compl. ¶ 24. While he was being moved, the parties agree that Mr. Lowe pointed out to the video camera operator that the officers moving him were dressed in personal protective equipment (PPE) and were all wearing masks, but that Mr. Lowe was not provided with a mask or any other protective gear. Id. ¶ 25.

In response to the COVID-19 pandemic, MOCC implemented various policies and orders, all of which were distributed by WVDCR to address and combat the spread and effect of the virus. See Operations and Procedure Orders, ECF Nos. 86-1, 86-2, 86-3, 86-4. The policies and orders were updated from time to time throughout the pandemic to address the changing WVDCR guidelines and directives regarding COVID-19. Id.

One such directive from WVDCR to "[a]ll facilities and work units within the Division[,]" including MOCC, dated March 20, 2020, and entitled Policy Directive 337.00, instructed that a control measure to prevent the spread of COVID-19 was to separate incarcerated individuals who were sick with viral

7

infection symptoms away from other incarcerated individuals in the general population.  See Policy Directive 337.00, ECF No. 88-2.  The policy directive instructed,

> A critical infection control measure for pandemic viral infection is to promptly separate incarcerated individuals who are sick with viral infection symptoms away from other incarcerated individuals in the general population. Incarcerated individuals can be isolated in private rooms. Alternatively, groups of sick incarcerated individuals can be cohorted together in a separate unit.
>
>  ***
>
> No special air handling is needed.

Id. at 10.

Policy Directive 337.00 further stated that quarantine units should ideally have attached bathrooms, but if not, then incarcerated individuals would have to wear face masks to use the bathroom outside of the room.  Id.  The policy also instructed that "[t]o minimize the likelihood of disease transmission, persons who are isolated or cohorted should wear a face mask while isolated[,]" and "[f]ace masks should be replaced as needed."  Id.  The policy directive established various other measures to control the spread of COVID-19, including, for example, increasing frequency of cleaning, (id. at 6); supplying inmates and staff with supplies for handwashing and hand sanitization, (id.); promoting and educating on good

8

health habits, (id. at 5); and providing Personal Protective Equipment ("PPE"), (id. at 8-9).

Another policy from WVDCR with the subject "Epidemic and Pandemic Outbreak Precautions and Procedures," and dated March 23, 2020, instructed that it applied to "all facility employees and to the inmate general population." Policy Directive 411, ECF No. 88-3 at 1. The policy continued under the heading "Procedure" that employees should "[i]dentify and [l]ist possible locations for isolation and quarantine," that "[i]solation and quarantine rooms do not require special air handling," and "[i]deally, these rooms have an attached bathroom. (If not, inmates must wear a mask while outside the isolation or quarantine room.)" Id. at 3.

Defendant Ames, who oversaw the handling of COVID-19 at MOCC, issued memoranda to MOCC employees establishing relaxed hygiene product limits, new "Rec Yard Procedures," internal COVID-19 testing protocols, and new daily schedules for prison units. See Memoranda, ECF No. 88-4. The memoranda are dated April 3, 2020, August 12, 2020, September 10, 2020, October 7, 2020, and December 1, 2020, respectively. Id. The April 3, 2020 memorandum, issued by defendant Ames, directed that "considering the State of Emergency concerning the COVID-19 Virus, cell limits on personal hygiene items have been relaxed.

Quilliams Inmates may order above cell limits of items such as soaps, shampoo and other cleaning items within reason." Memorandum, April 3, 2020, ECF No. 88-4.

The various policies also stressed the importance of frequently cleaning "high touch" surfaces, such as the showers shared by inmates.  While the defendants do not define "high touch" surfaces, the Operational Procedure defines "high touch surfaces" as "surfaces that are frequently touched and therefore can become contaminated with germs."  See Operational Procedure, ECF No. 86-3 at 7 (dated March 23, 2020).  With respect to "high touch" surfaces, each Unit was to develop a Housekeeping Plan

> designating those individuals (i.e. inmate workers) who
> would be responsible for performing these tasks.  At a
> minimum, those assigned individuals shall be required to
> clean high-contact areas within there [sic, their] are
> [sic, area] of responsibility no less than three (3) times
> during every eight (8) hour period.

Id.

Plaintiff has recently retained William Weber, MD, MPH, as an expert to review WVDCR and MOCC COVID-19 policies and procedures.  Dr. Weber submitted a report dated January 15, 2025.  See Dr. Weber Report.  Dr. Weber concluded in his 2025 report that MOCC policy encouraged isolation of COVID-19-positive inmates, and that "housing a patient with no known exposure to COVID-19 in close proximity to patients who were in

10

isolation and/or quarantine for COVID-19, puts the patient at needless risk for COVID-19 infection." <u>Id.</u> at 4.  He also noted in his report that

> people could be exposed to bodily substances or respiratory particles if they showered in quick succession without cleaning the shower area.  This type of situation would be the opposite of the 'separation of the sick from the well.' Such a situation would place people at needless risk of contracting COVID-19.

<u>Id.</u> at 3.

Defendant Toney recalled that after being placed in Pod 6 on September 7, 2020, plaintiff filed a grievance dated September 10, 2020, stating,

> On Monday, September 7, 2020 around 11 p.m. I was informed . . . that Captain Richard Toney unequivocally knew that behind the glass (Pod 6) was being used as quarantine for inmates who either tested positive for COVID-19 or were suffering from symptoms of the virus. Despite that knowledge, Capt. Toney forcefully had me placed behind the glass with inmates that were positive for COVID-19.

<u>See</u> Toney Dep., ECF No. 88-6 at 47:14-20; Grievance of Keith Lowe, ECF No. 86-8 at 5-6.  Plaintiff testified that he filed his grievance because "Larry Cantrell come in from another regional jail and said he felt sick and was positive and they put him back there."  <u>See</u> Lowe Dep. Tr., 32:24; 33: 1-2. Defendant Toney confirmed that the grievance reflected his signature.  <u>See</u> Toney Dep. Tr. at 47: 21-23.  In signing, Toney

11

responded "Due to your recent escape attempt I am forced to place you in the most secure location that I have."  Grievance of Keith Lowe, ECF No. 86-8 at 5-6.  Defendant Ames also acknowledged receipt of the grievance and responded "You are housed in our most secure housing due to your recent and second escape attempt.  We are doing all we can to stop the spread of COVID.  Also the cell you were placed into was cleaned before you [illegible]."[4]  Id.

    Other inmates being held in Pod 6 filed similar grievances.  On September 28, Benjamin Marcum filed a grievance complaining that

> Capt. Panick come to my cell in Pod 4 cell #1 and moved me
> to cell #1 in Pod 6 even though inmates who were behind the
> glass had tested positive for COVID-19 and some were still
> in quarantine and I have experienced the following:
> diarrhea, vomiting, my bones and joints hurt so bad I can
> barely move, shortness of breathe [sic] and a persistent
> cough.  I feel my move was done with the knowing intent on
> making me sick due to my recent use of force and the fact
> that my family has steady called here over my living
> conditions . . . .

Grievance of Benjamin Marcum, ECF No. 86-7 at 2.  Captain Toney confirmed his receipt of the grievance on September 29, 2020,

_____

[4] The superintendent's signature is illegible on the grievances, but each grievance includes a signature of a superintendent that is presumably that of Defendant Ames.  See id.  The grievance forms do not require signature by the commissioner, whose name is unclear from the record, but instead include a section entitled "Action by Commissioner" with options for the commissioner to mark to indicate whether the grievance has been accepted or rejected, and the reason for the decision.  See id.

and responded that "you were placed behind the glass due to causing a disturbance in Pod 4.  There was no one on quarantine when you were placed in your cell.  You will be moved shortly."  Id.  Defendant Ames also responded, "When you create disturbances you will be housed ANYWHERE that is deemed appropriate."  Id.  Neither defendant Toney nor defendant Ames indicate whether Marcum would be tested for COVID-19.

Terrel Davis arrived at MOCC from another facility on August 21, 2020, whereupon he was placed behind the glass for quarantine.  See Greivance of Terrel Davis, September 1, 2020, ECF No. 86-7 at 7.  On September 26, 2020, he filed a grievance complaining that, although his 14-day quarantine period had ended, he was still being housed in Pod 6 and "was exposed to inmates who either tested positive for COVID-19 or who were showing symptoms."  Grievance of Terrel Davis, 2020, ECF No. 86-7 at 6.  "As a result to [sic] Captain Toney's continued indifference[,]" he continues, "I was exposed to COVID-19 and got sick."  Defendant Toney responded on September 29, 2020, "You were placed in your current cell due to security reasons. You have been tested 2 times, and you were negative each time."[5]

---

[5] The record indicates that Terrel Davis was tested for COVID-19 sometime between arriving at MOCC on August 21, 2020, and September 1, 2020, when he filed a grievance stating "I transferred here to Mt. Olive from eastern regional jail on Aug 21, 2020.  Upon arrival was placed on fourteen-day quarantine.

<u>Id.</u>  Defendant Ames also responded on the same day, "You are behind the glass due to your negative behavior.  You can be housed anywhere that is deemed appropriate."  <u>Id.</u>

Upon receiving this response, Terrel Davis filed a grievance a day later on September 30, 2020, complaining that he was "exposed to people who either tested positive for COVID or who were showing signs of COVID unnecessarily," though he does not state who those people are.  Grievance of Terrel Davis, ECF No. 86-7 at 5.  Captain Toney responded, "Your actions at ERJ placed you in the cell you are in now."  <u>Id.</u>  Defendant Ames likewise responded, "Due to your actions at another facility you must be housed in the most secure housing possible.  The free public has [sic] and is exposed to persons that test positive for COVID."  <u>Id.</u>

Additional grievances filed by both plaintiff and other inmates reflect concern over contracting COVID-19 due to the state of Pod 6's showers.  Defendant Toney confirmed his receipt of and signature on a second grievance filed by plaintiff dated September 14, 2020, wherein plaintiff stated,

> Capt. With all due respect, I had to shower barefoot last
> night in a shower stall that has not been cleaned since who
> knows when.  It's the worst I've ever seen it, the walls

Since then I have been tested for COVID-19 and my test has come back negative . . . ."  Grievance of Terrel Davis, ECF No. 86-7 at 7.

> have spit, snot and scum on them.  I'm dead serious come
> look for yourself.  I showed Ms. Stephanie from mental
> health.  The guy next to me opens the shower, who has
> symptoms of COVID-19, blows his nose hacks and washes his
> face and mouth, so then he comes out of the shower and then
> I get put in the same shower stall without it getting
> cleaned . . . there is 20-30 fruit nats [sic, gnats] around
> in the shower seriously this ain't right.  I just want the
> shower cleaned on a regular basis I would be glad to clean
> it myself.

Grievance of Keith Lowe, ECF No. 86-8 at 3.  Defendant Toney

replied on September 18, 2020, that "[t]he unit schedule has

been adjusted to provide extra cleaning."  Id.  Defendant Ames,

referring to defendant Toney's response, responded "See above

response."  Id.  The record does not otherwise indicate whether

the cleaning schedule was adjusted.

        Plaintiff filed a third grievance, dated September 15,

2020, wherein plaintiff stated,

> After forcing me to be housed in quarantine behind the
> glass, Capt. Toney further placed me in a cell 602, which
> had not been cleaned for a long time, there was and still
> is feces smeared on the wall and by the door frame, crude
> [sic] in the toilet which smells of urine, pubic hairs and
> other "dust bunnies" liter the floor.  Since Sept. 7, 2020,
> I have repeatedly asked for cleaning supplies, a broom and
> a mop, on a daily basis, most CO's tell me you gotta ask
> Capt. Toney, we can't give you anything, another CO told me
> "that's what happens when you try to escape" and "I should
> have thought about that before I tried."

Grievance of Keith Lowe, ECF No. 86-8 at 4.  Defendant Toney

confirmed his receipt of the grievance eight days later, on

September 23, 2020, when he signed the grievance and responded,

"you will be provided with cleaning supplies."  Id.  Defendant

Ames, referring to defendant Toney's response, responded "See above response." <u>Id.</u>

On September 20, 2020, plaintiff filed a fourth grievance, wherein he stated

> Captain Toney this grievance is filed due to you using force on me 9/7/2020 which was against my Constitutional right to be free from cruel and unusual punishment when you forced me to be moved behind the glass in quarantine with other inmates who were infected with and tested positive for the COVID-19 virus, exposing me to catch COVID-19. Why would you do that Capt? I don't understand. You made me sick.[6] Did someone make you put me behind the glass? If so who?

Grievance of Keith Lowe, ECF No. 86-8 at 1. Defendant Toney confirmed receipt of the grievance on September 23, 2020. <u>Id.</u> Defendant Ames responded, "Moving you and changing your housing is NOT force. You can be moved at any time anywhere that is deemed appropriate." <u>Id.</u>

On November 2, 2020, plaintiff filed a fifth grievance, wherein he asked

> Capt. Toney. Really? [H]ow can you continue to use or have inmates back here on "quarantine," dude on B side said he just was sick from COVID-19, now here you go again putting inmates around other inmate who tested positive for COVID-19, on top of that the showers are not being cleaned much less sanitized. Why Capt. Toney why? Quarantine/Punishment, how does that go together. Don't make sense.

---

[6] Plaintiff's handwriting makes it difficult to tell whether he wrote "you made me sick" or "you make me sick."

<u>See</u> <u>id.</u> at 50:22-24, 51:1-4; Grievance of Keith Lowe, ECF
No. 86-8 at 2.  Defendant Toney confirmed his receipt of
the grievance seven days later on November 9, 2020, when he
responded "No inmates at MOCC are positive for the virus.
You are not in quarantine.  <u>Id.</u>  Defendant Ames responded,
"See above response."[7]

Defendant Toney also signed off on various grievances
filed during this time by other Quilliams inmates complaining of
COVID-19 exposure and unclean showers, at least one of whom
claims to have been confirmed positive for COVID-19.  On
September 2, 2020, Brandon Long filed the following grievance:

> On Friday August 28th I was tested for COVID-19 and on
> Sunday August 30th the C.O. came to my cell (Q1-601) and
> told me I tested positive and had to be moved to quarantine
> on Q2-604 behind the glass.  Then the nurses tell me that
> my test got mixed up with another inmate with the same
> name.  So, I've been behind the glass with positive cases
> quarantined when the whole time I'm negative.  I've been

---

[7] A report published by the West Virginia Department of Health
and Human Resources on November 15, 2020, shows that, by this
date, MOCC had zero active COVID-19 cases and zero tests pending
for a population of 1000.  <u>See</u> West Virginia Department of
Health and Human Resources, COVID-19 testing, W. Va Division of
Corrections and Rehabilitations As of 3 p.m., Nov. 15, 2020,
https://dhhr.wv.gov/COVID-19/Documents/COVID19_DCR_2020_11-
15_corrected.pdf.  The report cited by Dr. Weber, published on
February 9, 2022, shows that in the two months prior, MOCC saw
six deaths related to COVID-19, with four in September 2020, and
two in October 2020.  <u>See</u> Dr. Weber Report at 2, n. 4; West
Virginia Department of Health and Human Resources, <u>Inmate deaths
confirmed or possibly related to COVID-19</u> as of February 9,
2022.

showering after these people and not once has the shower been cleaned or disinfected in a week.

Grievance of Brandon Long, ECF No. 86-7 at 4.  Defendant Toney responded to Long's grievance on September 8, 2020, and stated that "I have talked to medical + they have informed me that your test was not mixed up with anyone else." Id.  Defendant Ames, referring to defendant Toney's response, likewise responded, "See above response."  Id.  The court understands the defendants' response to mean that Long's original positive COVID-19 test was correct and that he was subsequently moved to Pod 6, cell #604, for isolation.  Plaintiff was housed in Pod 6, cell #602.  See Grievance of Keith Lowe, ECF No. 86-8 at 4.

On August 22, 2020, Todd Boyes filed a grievance requesting that someone "Please clean showers with bleach to kill 'Covid' showers are dirty and have been dirty, everyone shares the showers they should be cleaned every shower day with bleach").  Grievance of Todd Boyes, ECF No. 86-7 at 8.  Defendant Toney signed off on August 24, 2020, noting that "germicidal is effective against COVID-19." Id.  Defendant Ames also acknowledged receipt of the grievance.  See id.

Defendant Toney testified that he was unaware whether plaintiff had tested positive or been exposed to COVID-19 prior to his disciplinary placement behind the glass.  See Toney Dep., ECF No. 88-6 at 51:11-15.  He further stated that he had no

18

concerns about placing an inmate who did not have COVID-19 in Pod 6, regardless of whether other inmates housed there were infected with COVID-19, because the inmates were housed in separate cells.  See id. at 51:16-24, 52:1-9.  Regarding plaintiff specifically, defendant Toney stated that he was not concerned about placing plaintiff in Pod 6 inasmuch as plaintiff "was in that cell by himself."  Id. at 52:8-9.  Defendant Ames likewise testified that COIVD-positive and COVID-negative inmates "wouldn't really have been mixed because they're in a single cell by themselves."  Ames Dep. Tr. at 52:3-7.  He further testified that "as far as them having contact with each other and touching each other and exchanging accidental bodily fluids, that can't happen."  Id. at 72:22-24.

Defendants Toney and Ames both stated that they were unsure whether individuals who tested positive for COVID-19 were being housed in isolation or in quarantine on Pod 6 at the time plaintiff was placed there.  See Toney Dep. Tr. at 51:20-24, 52:1; Ames Dep. Tr. at 87:10-14.[8]  As previously noted, however,

---

[8] Defendant Toney did not distinguish between "isolation" and "quarantine" and used those words interchangeably when describing the prison's COVID-19 response.  See id.  When asked to define "isolation" and "quarantine," Defendant Ames stated in his deposition, "Isolation is you test positive and you're going to be isolated in your cell, and if you're in the Quilliams Unit, you're going to be in a single cell because it's only single cells in the Quilliams 2 Unit."  Ames Dep. at 83:9-13. He went on to explain that "quarantine" applied to people who

the record indicates that on September 2, 2020, defendants Toney and Ames had signed off on Brandon Long's grievance, confirming that Mr. Long was positive for COVID-19, that his positive test was not mixed up with anyone else's, and that he was subsequently moved from Q1 to Pod 6 for isolation.  See Grievance of Brandon Long, ECF No. 86-7 at 4.

Regarding the showers, Defendant Ames testified that inmates in Pod 6 were housed individually, and though showers were shared, they were used separately by inmates who were escorted individually by corrections officers to use them.  See Ames Dep. Tr. at 52:21-24.  He explained, "any inmate who was on quarantine or if they were there [behind the glass] for isolation, if they were taken to the shower, they were given their shower, and then once they're put back up, the shower is to be cleaned before the next inmate is showered or before anybody else goes in there."  Id. at 81:16-21.  When asked "Do you have any way of knowing for certain that the showers at this time, say, September of 2020, were being cleaned in the way you described that they were supposed to be?", defendant Ames responded "Do I have proof? No, I did not physically see it."  Id. at 87:23-24, 88:1-4.

---

had been exposed to COVID-19 but tested negative for the virus. Id.

Defendant Toney was not asked this question but had the following exchange when asked about the shower procedure in Pod 6:

> Q: So, if you had an inmate who was on Q2 who tested positive [for COVID-19], where would they go to shower?
>
> A: They'd go to the shower.  To the best of my — if I remember correctly, they would either be first or last, because that shower would have to be cleaned.  The showers were cleaned.  We had a — oh, God, I don't want to guess. We had a green gun that we used to spray all over the place.

Toney Dep. Tr., ECF No. 88-6 at 40:9-16.

Plaintiff further testified that the cell in which he was placed in Pod 6 was not cleaned, had feces and urine in the toilet and, according to his grievance, feces smeared on the wall, contained items belonging to the previous resident, and that he was not provided with cleaning supplies.  See Lowe Dep. Tr. at 24:4-18.  Plaintiff filed a grievance dated September 15, 2020, about the condition of his cell, noting the "feces smeared on the wall and by the door frame" and that his repeated requests for cleaning supplies remained unfulfilled.  See Grievance of Keith Lowe, ECF No. 86-8 at 4.  On September 23, Captain Toney responded "[y]ou will be provided with cleaning supplies."  Id.  It is otherwise unclear from the record if and when plaintiff received these cleaning supplies, but the record suggests that his cell remained in this condition from at least September 7, 2020, when he was placed there, to September 23,

21

2020, when defendant Toney responded to his September 15 grievance.

Plaintiff testified that soon after he was placed behind the glass on September 7, 2020, he began experiencing symptoms of COVID-19. <u>See</u> Lowe Dep., ECF No. 88-7 at 30:11-15. Plaintiff stated that he had most recently been tested for COVID-19 sometime in August 2020, prior to being moved behind the glass, and that his test result was negative. <u>Id.</u> at 82:15-19.

Plaintiff stated that he "never had any effects or sick [sic] from COVID until September 7th, or something around there, 10th or something when I was placed behind the glass is when I started getting diarrhea." Lowe Dep., ECF No. 88-7 at 30:11-15. He testified that, in part for this reason, he believes he contracted COVID after being placed behind the glass. <u>See</u> Lowe Dep., ECF No. 88-7 at 32:1-4. Dr. Weber concluded in his report that diarrhea is a symptom of COVID-19. <u>See</u> Dr. Weber Report at 4.

Plaintiff testified both that he believed he was suffering from COVID-19 and to his belief that he suffered symptoms of "long COVID." <u>See</u> Lowe Dep., ECF No. 88-7 at 32:5-24; 33:11-21. Plaintiff added that he "periodically continued to have symptoms on and off of COVID throughout — I mean, *every*

bit of a year while I was behind the glass." Id. at 32:15-18.
Plaintiff further testified that "[d]uring my time [behind the
glass] in September, October, I was asking to be tested on a
daily basis, anybody who would listen to me[,]" and that from
September 2020 to March 2021, he never received a test for
COVID-19. Id. at 33:14-16; 82:12-16.

    Defendant Toney testified that he recalls plaintiff
reporting to him that plaintiff felt ill while he was in Pod 6.
See ECF No. 88-6, Toney Dep. Tr. at 80:21-24. He further
testified that "any time an inmate tells them [sic] they're
sick, especially back then with COVID, it always went to
medical." Id. at 81:5-7. When asked if he recalled whether
plaintiff went to medical after complaining of COVID-19
symptoms, defendant Toney responded, "No. Actually, medical
probably came down and talked to him." Id. at 81:11-12. The
record does not indicate whether this occurred or whether
defendant Toney reached out to medical on plaintiff's behalf.
When asked if he "recall[ed] ever directing anybody from medical
not to test an inmate[,]" defendant Toney answered "No." Id. at
77:18-20. Neither defendant has claimed that plaintiff was
tested before March 2021, nor have they produced any evidence to
this effect. When plaintiff was finally tested for COVID-19,
which he maintains was sometime in March 2021, the test returned

a negative result.  <u>See</u> Lowe Dep. ECF No. 88-7 at 82:12-20.
There is no suggestion in the record that defendant Ames was
aware of plaintiff's repeated requests for testing, and Ames has
testified that he does not know of any reason why an inmate
reporting symptoms would not be tested.  <u>See</u> Ames Dep. Tr. at
72:3-5.

Significantly, Dr. Weber stated in his report that

> Testing is an important public health measure to reduce the
> risk of infectious disease transmission in a congregate
> living space such as a correctional facility.  Testing can
> help determine whether a patient is indeed infected,
> facilitating isolation of the sick and quarantine of the
> exposed.  Testing also provides better statistics about
> disease prevalence that can guide decisions about
> lockdowns.  A memo circulated on 6/1/2020 noted that all
> DCR prisons and jails were beginning onsite COVID-19
> testing.
>
> **XXX**
>
> In September 2020, patients who reported symptoms of COVID-
> 19 such as chest pressure, body aches, difficulty
> breathing, or diarrhea should have received prompt testing
> for COIVD-19.  Failing to do so without clear rationale
> would violate facility policy as well as generally-
> recognized public health practice to reduce the spread of
> infectious disease.  If testing was available, failing to
> test for COVID-19 would fall below the medical standard of
> care, especially in a congregate setting.

Dr. Weber Report at 4.

B. Procedural History

Plaintiff filed the original complaint <u>pro se</u> dated
September 28, 2022, and filed with the Clerk on October 5, 2022.

24

ECF No. 1.  On December 7, 2023, with leave of the court, plaintiff, still proceeding pro se, filed an Amended Complaint to which he attached an affidavit.  See ECF No. 27 ("First Am. Compl.").  On February 21, 2024, after counsel was appointed for plaintiff, and with leave of the court, plaintiff's counsel filed on his behalf a Second Amended Complaint. See ECF No. 39 ("Sec. Am. Compl.").

Defendants filed on March 6, 2024, a motion to dismiss the Second Amended Complaint, (ECF No. 40), along with a memorandum of law in support thereof, (ECF No. 41).  Plaintiff, by counsel, responded in opposition to the motion on March 20, 2024.  ECF No. 42.

On June 28, 2024, the court entered a now-vacated memorandum opinion and order, (ECF No. 59, ("Vacated Order")), and judgment order, (ECF No. 60), granting defendants' motion to dismiss on statute of limitations grounds.  The court granted the motion on the basis that the West Virginia statute of limitations, deemed applicable for section 1983 actions, is two years, see W. Va. Code § 55-2-12, and the plaintiff, in his amended complaint as of that time, failed to "place one or more of [defendants' violations] within the statutory limitation period.  Vacated Order at 24 (citing DePaola v. Clarke, 884 F.3d 481, 484-85, 487 (4th Cir. 2018)).

The court otherwise concluded that plaintiff had pled "enough facts to state a claim that is plausible on its face." Id. (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555-58 (2006)). Specifically, the court concluded at the then motion to dismiss stage that the defendants had not shown at that juncture that they were entitled to qualified immunity, but that plaintiff's claims must nevertheless be dismissed inasmuch as he failed to allege any continuing or ongoing deprivation of plaintiff's Eighth Amendment rights that occurred within two years prior to the date the original complaint was filed. Id. at 27, 34.

Plaintiff filed on July 26, 2024, a motion under Rule 60 (b)(1) of the Federal Rules of Civil Procedure to alter or amend judgment, noting that plaintiff's counsel, due to mistake, inadvertence, surprise, or excusable neglect, omitted a date in the second amended complaint that plaintiff had in fact included in his pro se first amended complaint that alleged harm within the limitations period. See Order, ECF No. 61.

In the Second Amended Complaint filed by plaintiff's newly appointed counsel, the last date complained of occurred on September 20, 2020, which placed plaintiff's harm outside the operative limitations period. See ECF No. 59 (citing Second Am. Compl.). However, in an affidavit that was incorporated into

26

plaintiff's <u>pro</u> <u>se</u> First Amended Complaint, plaintiff stated that on November 2, 2020, he had filed a grievance regarding his continued housing behind the glass and that defendants continued to use Pod 6 as a COVID-19 quarantine unit.  <u>Id.</u> at 2 (citing First Am. Compl., ECF No. 27-1 at ¶ 53.)  Inclusion of the November 2, 2020, date, if proven, would place plaintiff's complained-of harm within the limitations period.

In the motion to alter or amend judgment, plaintiff's counsel argued that inclusion of the November 2, 2020 allegation, which plaintiff himself had alleged <u>pro</u> <u>se</u>, likely would have resulted in a different outcome in the court's analysis of the statute of limitations imposed on plaintiff's claims.  <u>Id.</u>

The court granted plaintiff's motion to alter or amend under Rules 60(b)(1) and 59(e) by memorandum opinion and order, (ECF No. 64 ("Rule 60(b)(1) Order")), and judgment order, (ECF No. 65), entered on November 5, 2024.  The court ordered vacation of its previous memorandum opinion and order, <u>see</u> Vacated Order, and judgment order, (ECF No. 60), set a schedule for the case to proceed, and permitted the plaintiff to file a third amended complaint.  <u>See</u> Rule 60(b)(1) Order.  The plaintiff, by counsel, filed his Third Amended Complaint on November 27, 2024, in which the previously omitted allegation on

27

the date of November 2, 2020, was included.  <u>See</u> Third. Am.
Compl.  The defendants filed an Answer to the Third Amended
Complaint on December 6, 2024.  ECF No. 71 ("Defs.' Answer").

The parties proceeded through discovery, and each
filed their respective dispositive motions for summary judgment
that are now ripe for adjudication.

## II. LEGAL STANDARD

A party is entitled to summary judgment "if the
pleadings, the discovery and disclosure materials on file, and
any affidavits show that there is no genuine issue as to any
material fact and that the movant is entitled to judgment as a
matter of law."  Fed. R. Civ. P. 56(c).  Material facts are
those necessary to establish the elements of a party's cause of
action.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248
(1986).

A genuine issue of material fact exists if, in viewing
the record and all reasonable inferences drawn therefrom in a
light most favorable to the non-moving party, a reasonable
factfinder could return a verdict for the non-movant.  <u>Id.</u>  The
moving party has the burden of showing - "that is, pointing out
to the district court - that there is an absence of evidence to
support the nonmoving party's case."  <u>Celotex Corp. v. Catrett</u>,

28

477 U.S. 317, 325 (1986).  If the movant satisfies this burden, then the non-movant must set forth specific facts as would be admissible in evidence that demonstrate the existence of a genuine issue of fact for trial.  Fed. R. Civ. P. 56(c); id. at 322-23.  A party is entitled to summary judgment if the record as a whole could not lead a rational trier of fact to find in favor of the non-movant.  Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991).

### III. ANALYSIS

#### A. Statute of Limitations

Neither party in its motions for summary judgment or the briefing thereon addresses the statute of limitations issue that was the basis of the court's now-vacated order granting defendants' motion to dismiss.  See Vacated Order.  It is noted that the defendants do provisionally list the statute of limitations as an affirmative defense in their answer to the operative amended complaint.  See ECF No. 71 at 14.

In the Rule 60(b)(1) Order, the court acknowledged its prior conclusion that a two-year statute of limitation applied to plaintiff's claims under W. Va. Code § 55-2-12, and the plaintiff failed to "place one or more of [defendants' violations] within the statutory limitation period."  See Rule

60(b)(1) Order at 1-2 (citing Vacated Order at 24). Inasmuch as the latest date of alleged harm contained in plaintiff's Second Amended Complaint occurred on September 20, 2020, plaintiff's alleged harm would have occurred outside of the limitations period. See Vacated Order at 23-34.

The court recognized that plaintiff's pro se first Amended Complaint contained an affidavit in which plaintiff alleged that he had filed a grievance against defendants on November 2, 2020, alleging continued harm, but plaintiff's counsel failed to include that allegation and date in the Second Amended Complaint. See Rule 60(b)(1) Order at 1-2 (citing First Am. Compl., ECF No. 26). The court explained, "This allegation, if proven, and if established that plaintiff was still confined at the time when he filed the grievance, would place plaintiff's alleged injury within the limitations period." Id. at 2.

As noted, neither party has addressed this issue in the motions for summary judgment or related briefing. Nevertheless, the court concludes, upon review of the record, that the record supports the conclusion that plaintiff was still confined in the Quilliams Unit on November 2, 2020. Plaintiff provided the grievance reflecting the November 2, 2020 date as an exhibit to his motion for summary judgment, (ECF No. 86-8 at 2), and plaintiff stated in his deposition that he remained

behind the glass for "every bit of a year," (Lowe Dep. at 32:17-18). Taken together with the undisputed fact that he was placed behind the glass on September 7, 2020, the record supports that plaintiff remained on Pod 6 on November 2, 2020.

Accordingly, the court concludes that plaintiff has shown continued harm on November 2, 2020, which placed his complaint within the two-year limitations period.

B. Official Capacity Claims

Plaintiff has sued defendants in their official capacities and "seeks whatever equitable relief this Court deems appropriate, such as but not limited to, any injunctive and declaratory relief." See Third Am. Compl. at 13. While the Eleventh Amendment to the United States Constitution ordinarily bars federal courts from entertaining suits against individual states, federal courts may award injunctive and declaratory relief from state officials whose actions run afoul of controlling federal law. See Ex parte Young, 209 U.S. 123 (1908). "In determining whether the doctrine of Ex parte Young avoids an Eleventh Amendment bar to suit, a court need only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." Verizon Maryland, Inc. v. Pub. Serv. Comm'n of Maryland, 535 U.S. 635, 645 (2002)

(quoting <u>Idaho v. Coeur d'Alene Tribe of Idaho</u>, 521 U.S. 261,
296 (1997) (O'CONNOR, J., joined by SCALIA and THOMAS, JJ.,
concurring in part and concurring in judgment)).

Plaintiff in this case has not alleged any ongoing
violations of federal law.  His claims relate to actions taken
by defendants during the COVID-19 pandemic in the years 2020-
2021, and he has not alleged, for example, that he continues to
be exposed to a heightened risk of contracting COVID-19, or that
he was denied access to COVID-19 testing after March 2021.
Inasmuch further as injunctive and declaratory relief has not
been sought, his claims against defendants in their official
capacities appear not to be cognizable.

C. Qualified Immunity

The court turns now to plaintiff's claims against the
defendants in their individual capacities.  Plaintiff claims
that he is entitled to relief under 42 U.S.C. § 1983 due to
violation by the defendants of the Eighth Amendment to the
United States Constitution inasmuch as plaintiff asserts that
defendants were deliberately indifferent to a substantial risk
of serious harm to plaintiff.  <u>See</u> Third Am. Compl. at ¶ 73-79.
Plaintiff argues that he is entitled to summary judgment
inasmuch as, he contends, no genuine issues of material fact
exist regarding defendants' deliberate indifference to

32

plaintiff's health and safety. See Pl.'s Motion for Summ. J. at 1.

Defendants counter that they are entitled to summary judgment on the defense of qualified immunity inasmuch as, they contend, their conduct did not violate clearly established law, and they were not deliberately indifferent. See Defs.' Motion for Summ. J. at 1.

The court notes that it previously concluded in its now-vacated order, at the motion to dismiss stage, that the plaintiff "pled sufficient facts to allege that defendants acted with deliberate indifference, satisfying the subjective prong at this [motion to dismiss] stage[,]" inasmuch as plaintiff had alleged facts in the then operative amended complaint that would establish that the defendants were "acutely aware of th[e] risk" that plaintiff would contract the COVID-19 virus when they placed him behind the glass. See Vacated Order. The court now, at the summary judgment stage, reviews the evidence produced to determine whether either side has established that there is no genuine issue of material fact on the issue of qualified immunity.

In a section 1983 claim, the plaintiff must plead and prove that "each Government-official defendant, through the official's own individual actions, has violated the

33

Constitution." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 676 (2009).  In deciding the legal question of whether a reasonable official would have known that the alleged actions violate "clearly established" law, a court must determine whether the actions would infringe "particularized" rights claimed by the plaintiff. <u>Anderson v. Creighton</u>, 483 U.S. 635, 640 (1987).  Ruling on a defense of qualified immunity requires "(1) identification of the specific right allegedly violated; (2) determining whether at the time of the alleged violation the right was clearly established; and (3) if so, then determining whether a reasonable person in the [official's] position would have known that doing what he did would violate that right." <u>Pritchett v. Alford</u>, 973 F.2d 307, 312 (4th Cir. 1992).

> 1. Plaintiff had a clearly established right to be free from unnecessary exposure to COVID-19.

A right is clearly established if existing precedent — either controlling case law or a "consensus of persuasive authority" from other Circuits — has placed the question beyond dispute. <u>Booker v. S.C. Dep't of Corr.</u>, 855 F.3d 533, 544 (4th Cir. 2017) (citing <u>Taylor v. Barkes</u>, 575 U.S. 822, 825 (2015)). "It bears emphasizing that 'the lodestar for whether a right was clearly established is whether the law gave the officials 'fair warning' that their conduct was unconstitutional." <u>Pfaller v.</u>

Amonette, 55 F.4th 436 (4th Cir. 2022) (quoting Iko v. Shreve, 535 F.3d 225, 238 (4th Cir. 2008)).

        The court must first define the specific right at issue, inasmuch as the Supreme Court has consistently admonished that courts are "not to define the clearly established law at a high level of generality." City of Escondito v. Emmons, -- U.S. -- 139 (2018). But the question of whether a right was clearly established examines not whether "the very action in question has previously been held unlawful," but whether, "in light of the pre-existing law[,] the unlawfulness" of the action was "apparent." Wilson v. Layne, 526 U.S. 603, 615 (2009). And the Fourth Circuit "require[s] less specificity in [the] Eighth Amendment Context." Younger v. Crowder, 79 F.4th 373, 386 (4th Cir. 2023).

        The clearly established right claimed in plaintiff's Third Amended Complaint is plaintiff's right to be free from unnecessary exposure to "[t]he COVID-19 virus [that] created a substantial risk of serious harm leading to pneumonia, respiratory failure, or death." Third Am. Compl. at ¶ 76 (citing Wilson v. Williams, 961 F.3d 829, 840 (6th Cir. 2020)) (additional citation omitted).

        Neither the United States Supreme Court nor the Fourth Circuit has ruled whether COVID-19-negative prisoners had a

right not to be exposed to COVID-19-positive inmates.  But the
Supreme Court has held that "prison authorities may not be
deliberately indifferent to . . . a condition of confinement
that is sure or very likely to cause serious illness[.]"
<u>Helling v. McKinney</u>, 509 U.S. 25, 33 (1993).  In that case, the
Court found that prison officials had been deliberately
indifferent to an inmate in the Nevada prison system by
assigning him to share a cell with an inmate who smoked five
packs of cigarettes per day.  <u>See id.</u> at 28.  In so holding, the
Court also clarified that prison officials may not "be
deliberately indifferent to the exposure of inmates to a
serious, communicable disease on the ground that the complaining
inmate shows no serious current symptoms."  <u>Id.</u> at 33.

 Using <u>Helling</u> as a guide, three circuits have
concluded that such a right existed, though two did so in
unpublished opinions.  <u>See</u> <u>Nazario v. Thibeault</u>, No. 22-1657,
2023 WL 7147386 (2d Cir. Oct. 31, 2023); <u>see</u> <u>Gordon v. Burt</u>, No.
23-1775, 2024 WL 1842873 (6th Cir. Apr. 24, 2024) <u>cert.</u>
<u>denied</u>, 145 S. Ct. 1046, 220 L. Ed. 2d 378 (2025); <u>see</u> <u>Hampton</u>
<u>v. California</u>, 83 F.4th 754 (9th Cir. 2023), cert. denied sub
nom. <u>Diaz v. Polanco</u>, No. 23-722, 2024 WL 2116277 (U.S. May 13,
2024); <u>see</u> <u>also</u> <u>Anderson v. Long</u>, No. 23-1050, 2023 WL 8543932
(10th Cir. Dec. 11, 2023), cert. denied, 144 S. Ct. 1377 (2024)

(declining to decide whether such a right existed, but affirming the district court's finding that no constitutional violation occurred where defendant prison Warden was not aware of plaintiff's particular vulnerabilities to COVID-19). Of those Circuit Court decisions, the Second, Sixth, and Ninth Circuits analyzed whether the right was clearly established, and all three found that it was.

In Nazario, the United States Court of Appeals for the Second Circuit affirmed a district court's denial of summary judgment to a defendant prison official, the former Deputy Warden at Osborn Correctional Institution, on qualified immunity grounds. See Nazario, No. 22-1657 at *2. As relevant, the Second Circuit affirmed the district court's ruling that the defendant warden was not entitled to qualified immunity where, in April of 2020, defendant "Thibeault knew of Covid-19-positive and/or symptomatic inmates in E-Block and disregarded the risk associated with Nazario's transfer there." Nazario v. Thibeault, No. 22-1657, 2023 at *2 WL 7147386 (2d Cir. Oct. 31, 2023). The court concluded that a clearly established right not to be exposed to COVID-19 existed under the Helling standard "that prison officials may not 'be deliberately indifferent to the exposure of inmates to a serious, communicable disease[.]'" Id. (citing Helling, 509 U.S. at 33).

37

In <u>Gordon</u>, the United States Court of Appeals for the Sixth Circuit twice vacated and remanded district court orders granting prison officials' motion to dismiss under Federal Rule of Civil Procedure 12(b)(6).  <u>See</u> <u>Gordon</u>, No. 23-1775 at *3. Plaintiff alleged that he contracted COVID-19 in August of 2020. He alleged that, at this time, defendants, Warden Burt and Deputy Steward, were "purposefully housing him [in the same unit] with close contact prisoners," that the close-contact prisoners were allowed to access the same areas as the non-close-contact prisoners, and that the common spaces were not being sanitized.  <u>See</u> <u>Gordon v. Burt</u>, No. 21-1832, slip op. at 9 (6th Cir. August 17, 2022).  The district court had held that the plaintiff had failed to state an Eighth Amendment violation, finding that "the mere fact that prisoners were housed in dormitory style units is insufficient to establish deliberate indifference." <u>Gordon v. Burt</u>, No. 1:21-CV-415, 2021 at *5 WL 4891546 (W.D. Mich. Oct. 20, 2021).  Reversing the district court, the Sixth Circuit found that Gordon had sufficiently stated a deliberate indifference claim where he alleged defendants were "purposefully housing him [in the same unit] with close-contact prisoners, allowing close-contact prisoners to commingle freely with the other prisoners, and not sanitizing areas occupied by close-contact prisoners." <u>Gordon v. Burt</u>, No. 21-1832, slip op. at 9 (6th Cir. August 17, 2022).

38

On remand, the district court again dismissed Gordon's claim, this time on qualified immunity grounds, reasoning that "Plaintiff does not allege that he was placed in a cell with a COVID-19 positive prisoner or even a close-contact prisoner[,]" and so had not shown that a clearly established right had been violated. Gordon v. Burt, No. 1:21-CV-415, 2023 at *2 WL 3914934 (W.D. Mich. June 9, 2023), vacated and remanded, No. 23-1775, 2024 WL 1842873 (6th Cir. Apr. 24, 2024), cert. denied, 145 S. Ct. 1046 (2025). For the second time, the Sixth Circuit reversed. Like the Second Circuit, the Sixth Circuit concluded that under Helling, prisoners had a clearly established right to be protected against unnecessary exposure to COVID-19. The court emphasized that "prisoners have limited or no ability to protect themselves, [so] prison officials have a duty to protect them from involuntary exposure to dangerous prison conditions." Gordon v. Burt, No. 23-1775, 2024 at *2 WL 1842873 (6th Cir. Apr. 24, 2024), cert. denied, 145 S. Ct. 1046 (2025) (citing Helling, 509 U.S. at 35).

In Hampton, the United States Court of Appeals for the Ninth Circuit, considering an interlocutory appeal of the defendants, "high level officials in the California prison system[,]" affirmed the district court's conclusion that the wife of a deceased inmate had pled enough facts to establish

that prison officials had violated the decedent's clearly
established right not to be exposed to COVID-19.  Hampton, 83
F.4th at 770.  The decedent's wife alleged that on May 30, 2020,
the decedent prisoner was exposed to COVID-19 through the prison
officials' deliberate indifference when the officials initiated
a transfer of 122 inmates with high-risk medical conditions to
San Quentin State Prison, where there were no known COVID-19
cases.  Id. at 759.  Even though some inmates began to show
symptoms during the transfer, the inmates were not quarantined
upon their arrival at San Quenten, and the defendants "had them
use the same showers and eat in the same mess hall as other
inmates."  Id.  Like the Second and Sixth Circuits, the Ninth
Circuit found that the right of the prisoner not to be exposed
to COVID-19 was clearly established inasmuch as the Ninth
Circuit had previously held in Parsons v. Ryan, 754 F.3d 657
(9th Cir. 2014) that "a prison's failure to 'provide prisoners
with . . . protection from infectious diseases' (among other
deficiencies) was 'firmly established in our constitutional
law.'"  Id. at 664, 676 (citing Helling, 509 U.S. at 33).

        Given the consensus of the Second, Sixth, and Ninth
Circuits which have considered this issue and extended the
Helling standard to the COVID-19 context in instances that
occurred in April 2020, August 2020, and May 2020, respectively,

the court concludes that a clearly established right existed at the time of plaintiff's alleged harm, September 7, 2020, to November 2, 2020, for prisoners to be free from unnecessary exposure to COVID-19.

> ## 2. Whether defendants were deliberately indifferent to the risk that plaintiff would develop COVID-19

Under the Eighth Amendment, a prisoner has the right to be free from cruel and unusual conditions of confinement. Rhodes v. Chapman, 452 U.S. 337, 347 (1981). Though the constitution "does not mandate comfortable prisons," id. at 350, it does not permit inhumane ones, and "the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." Helling v. McKinney, 509 U.S. 25, 31 (1993). Conditions of confinement that expose prisoners to serious, communicable diseases can establish an Eighth Amendment violation. Id. at 35. Moreover, the Eighth Amendment "proscribes more than physically barbarous punishments[,]" but also "embodies 'broad and idealistic concepts of dignity, civilized standards, humanity, and decency' . . . against which we must evaluate penal measures." Estelle v. Gamble, 429 U.S. 97, 102 (1976) (quoting Jackson v. Bishop, 404 F.2d 571, 579 (C.A.8 1968).

Prisoners alleging "that they have been subjected to unconstitutional conditions of confinement must" satisfy both an objective and a subjective prong. <u>Scinto v. Stansberry</u>, 841 F.3d 219, 225 (2016). The objective prong requires the plaintiff to "demonstrate that the deprivation alleged was, objectively, sufficiently serious." <u>Id.</u> (quoting <u>Farmer v. Brennan</u>, 511 U.S. 825, 834 (1994). "To be 'sufficiently serious,' the deprivation must be 'extreme'— meaning that it poses a 'serious or significant physical or emotional injury resulting from the challenged conditions,' or 'a substantial risk of serious harm resulting from . . . exposure to the challenged conditions.'" <u>Id.</u> (quoting <u>De'Lonta v. Angelone</u>, 330 F.3d 630, 634 (4th Cir. 2003).

Citing <u>Wilson v. Williams</u>, 961 F.3d 829, 840 (6th Cir. 2020), which held that the objective prong was 'easily satisfied' by the transmissibility of COVID-19 and the seriousness of its symptoms in conjunction with other factors, defendants "do not contend that plaintiff is unable to satisfy the objective prong of a conditions of confinement claim." <u>See</u> Defs.' Mem. Supp., ECF No. 89 at 11-12. Given defendants' concession, the court therefore finds that plaintiff has satisfied the objective prong.

The subjective prong requires that the inmate allege that "prison officials acted with 'deliberate indifference.'" __Porter v. Clarke__, 923 F.3d 348 (4th Cir. 2019), __as amended__ (May 6, 2019) (quoting __Scinto__, 841 F.3d at 225)). "To prove deliberate indifference, plaintiff[] must show that 'the official kn[ew] of and disregard[ed] an excessive risk to inmate health or safety.'" __Id.__ (quoting __farmer__, 511 U.S. at 837). A plaintiff may satisfy this standard by "prov[ing] by circumstantial evidence that a risk was so obvious that it had to have been known." __Makdessi v. Fields__, 789 F.3d 126, 136 (4th Cir. 2015). "Put differently, '[a]n obvious risk of harm justifies an inference that a prison official subjectively disregarded a substantial risk of serious harm to the inmate." __Porter__, 923 F.3d at 361 (quoting __Schaub v. VonWald__, 638 F.3d 905, 915 (8th Cir. 2011)). But where there is a "legitimate penological justification" for the challenged conditions of confinement, courts will account for such a justification "in considering whether [the] adverse treatment is sufficiently gratuitous to constitute punishment for Eighth Amendment purposes." __Id.__ at 362 (quoting __Grenning v. Miller-Stout__, 739 F.3d 1235, 1240 (9th Cir. 2014).[9]

---

[9] __Porter__ notes that "the exact role of penological justification in analyzing an Eighth Amendment conditions of confinement case is unsettled[,]" and that courts are split between whether to

Defendants maintain that the subjective prong has not been satisfied because they had a legitimate penological justification for placing plaintiff behind the glass and because they responded reasonably to the corresponding risk that plaintiff would develop COVID-19.  <u>See</u> Defs.' Mem. Supp., ECF No. 89 at 12-18.

Plaintiff was "a dangerous inmate who had just attempted to escape from Mount Olive immediately prior to being placed behind the glass."  <u>Id.</u> at 13.  In addition to this being plaintiff's third escape attempt, plaintiff had been found three years prior "to be in possession of a commercially manufactured knife, cell phone, marijuana pipe, and bit driver with the specific bit necessary to tamper with hardware at Mount Olive."  <u>Id.</u> at 14. Defendants, concerned that plaintiff would attempt to escape once more, acquire more contraband, or both, placed him in the only feasible secured area — behind the glass — despite knowing that Pod 6 was being used as a quarantine/isolation unit at the

_____

analyze penological justifications as part of the subjective prong, the objective prong, or as a separate inquiry altogether. 923 F.3d at 362.  The court concludes, however, that the "clearest way penological justification factors into 'conditions of confinement cases' is through the subjective prong inquiry[.]"  <u>Id.</u>  The court will therefore account for penological justifications in the subjective prong.

time.  Thus, defendants maintain that their actions had a
penological justification.  Id. at 15.

Additionally, defendants maintain in their briefing that
they responded reasonably to the risk that plaintiff would
develop COVID-19 whilst behind the glass.  Id.  They emphasize
that they "put in place numerous efforts to help alleviate the
spread of COVID-19[,]" including limiting visitor access,
screening employees and new intakes for COVID-19, isolating and
quarantining exposed inmates, implementing social distancing
measures, conducting routine testing in accordance with public
health guidelines, increasing cleaning frequency for shared
areas, and furnishing inmates with supplies for handwashing and
sanitation, as well as PPE.  Id. at 16-17.  And they contend
that the risk to plaintiff was low because he was housed in an
individual cell.  Id.  But the record indicates that the
communal showers in Pod 6 were not being cleaned in accordance
with prison policy even after defendants were alerted to this
fact.  And despite plaintiff's testimony that he was symptomatic
and requested COVID-19 tests daily in September and October of
2020, and despite grievances from other inmates complaining of
exposure to COVID-19 in others or themselves, he did not receive
a COVID-19 test until March of 2021.

The precautions taken by defendants notwithstanding, plaintiff claims that he was forced to move into Pod 6, where COVID-19-positive inmates were being isolated and where new intakes were being quarantined.  He was moved into a cell with "feces smeared on the wall and by the door frame" and his requests for cleaning supplies went unfulfilled for a week or more, compelling him to file a grievance on September 15, 2020.[10] See Grievance of Keith Lowe, ECF No. 86-8 at 4.  The record also contains four grievances spanning August 22, 2020 to November 2, 2020, from three inmates — Todd Boyes, Brandon Long, and Keith Lowe — complaining that they were forced to share unclean showers with COVID-19-positive inmates and that the showers were not being cleaned or disinfected.  Inmates such as Benjamin Marcum and Terrel Davis likewise filed grievances in late September 2020 complaining that they were exposed to COVID-19-positive inmates while being housed behind the glass and, in the case of Benjamin Marcum, became symptomatic.  See Grievance of Benjamin Marcum, ECF No. 86-7 at 2; Grievance of Terrel Davis, id. at 6.  One week before plaintiff was moved to Pod 6, at least one inmate, Brandon Long, was moved to Pod 6 for isolation after testing positive for COVID-19 on August 30, 2020.

---

[10] As previously noted, defendant Toney responded on September 23, 2020, that he would provide the plaintiff with cleaning supplies, though it is unclear if or when this occurred.

Plaintiff's own grievance from September 14, 2020, notes
that the walls of the shower were covered with "spit, snot and
scum," that he watched another inmate, allegedly with symptoms
of COVID, spit phlegm into the shower right before plaintiff was
forced to use it, and that the showers were infested with fruit
flies.  See Grievance of Keith Lowe, ECF No. 86-8 at 3.  He
complains again on November 2, 2020, that "the showers are not
being cleaned much less sanitized."  See Grievance of Keith
Lowe, ECF No. 86-8 at 2.  Mount Olive's policies mandated that
"high touch surfaces" were to be cleaned, at minimum, nine times
per every 24-hour period.  See Operational Procedure, ECF No.
86-3 at 7 (dated March 23, 2020).  Despite acknowledging that
the showers were supposed to be disinfected regularly, defendant
Ames admitted he had no proof that this occurred.  See Ames
Dep., ECF No. 88-5 at 87-88.  Defendant Toney likewise could not
confirm that such cleaning occurred, though he stated that,
"[t]o the best of my — if I remembered correctly, [COVID-
positive inmates on Q-2] would either be first or last, because
that shower would have to be cleaned.  The showers were
cleaned."  See Toney Dep. Tr., ECF No. 88-6 at 40:9-16.
Plaintiff, Brandon Long, and Todd Boyes, however, all
affirmatively state that the showers were not being cleaned.
Plaintiff's medical expert stated in his report that sharing

showers without cleaning between uses increases the risk of
contracting COVID-19.  See Dr. Weber Report at 3.

Finally, plaintiff has testified that when he allegedly
fell ill, experiencing symptoms common to COVID-19, he was
denied access to COVID-19 tests.  See ECF No. 88-7, Keith Lowe
Dep. Tr. at 33:14-16 ("Because during my time in September,
October, I was asking to be tested on a daily basis, anybody who
would listen to me.").  Defendant Toney testified that he
recalled plaintiff informing him that he felt ill.  See Toney
Dep. Tr. at 80:21-24.  Despite this, plaintiff did not receive a
COVID-19 test until March 2021.  Plaintiff's medical expert has
stated that failing to test symptomatic inmates "without clear
rationale would violate facility policy" and "fall well below
the medical standard of care, especially in a congregate
setting."  Dr. Weber Report at 4.  As mentioned, there is no
evidence in the record to suggest that defendant Ames was aware
of plaintiff's requests for testing.

Even though defendants had a legitimate penological
justification for their initial decision to place plaintiff in a
separate cell in Pod 6, such a justification does not extend to
the unsanitary condition of Q-2's showers, plaintiff's cell,
and, in the case of defendant Toney, the refusal of his requests
for medical testing, to which plaintiff has testified.  See

Keith Lowe Dep. Tr. at 33:14-16; 82:12-16 (testifying that plaintiff requested tests daily in September and October of 2020 and that he was not tested until "March 2021 time, you know, way after."). Once plaintiff was behind the glass, "[a] Prison official's duty" to him "under the Eighth Amendment is to ensure "'reasonable safety.'" Farmer, 511 U.S. at 844 (quoting Helling, 509 U.S. at 33). Here, defendants exposed inmates to an increased risk of contracting COVID-19, failed to follow their own procedures for mitigating that risk, and ignored the pleas of the inmates regarding violations of those procedures. While their initial decision to put plaintiff in a secure area may be penologically justified, the conditions of confinement in Pod 6 and the denial of testing to plaintiff are not.

In this context, defendants cannot be said to have acted reasonably with respect to the risk. Defendants rely on Hallinan v. Scarantino, 466 Supp. 3d 587 (E.D.N.C. 2020) for the proposition that their myriad precautions establish that they acted reasonably. See Defs.' Mem. Supp., ECF No. 89 at 15-18. Similarly, they cite an unpublished district court opinion, Zellers v. Northam, No. 7:21-cv-393, 2022 WL 3711892 (W.D. Va. Aug. 29, 2022), for the proposition that "the occasional failure of the policies or failure of the policies to be followed" is insufficient to establish liability under the Eighth Amendment.

But both cases miss the mark here.  Hallinan involved inmates at a Federal Correctional Complex seeking injunctive relief —immediate release from their confinement — in response to the prison's failure to prevent the spread of COVID-19.  466 Supp. 3d at 590.  In denying injunctive relief, the district court noted that the only evidence plaintiffs had presented that the prison's COVID-19 policies were not being followed, or were otherwise insufficient, was the spread of the virus itself.  "While this evidence is tragic, continued spread of a novel, highly contagious virus cannot standing alone establish respondents failed to reasonably respond to the virus."  Id. at 607.

Zellers concerned an inmate in the Virginia Department of Corrections ("VDOC") alleging that certain officials in the prison were deliberately indifferent to his risk of contracting COVID-19 by failing to release him on parole, failing to decrease the prison population generally, and failing to adhere to the prison's stated policies of contact tracing, cleaning shared surfaces, and enforcing social distancing.  Zellers v. Northam, No. 7:21-cv-393, 2022 WL at *2 3711892 (W.D. Va. Aug. 29, 2022).  In particular, the plaintiff in Zellers "believe[d] he was exposed to COVID-19 when he went to the administration building" for a parole hearing on the basis that there was no

PPE or hand sanitizer available in the building.  Id.  Whilst there, he "claims that he contracted COVID-19 from the officer who was monitoring the building's gatepost, although he does not explain how he knows this."  Id.

The circumstances of these two cases are markedly different from those here.  Sometime between August 28, 2020, and August 30, 2020, Brandon Long tested positive for COVID-19 and was moved to Pod 6 for isolation.  See Grievance of Brandon Long, ECF No. 86-7 at 4.  Plaintiff was then moved, over his objections and for disciplinary reasons, to Pod 6 on September 7, 2020, into a cell smeared with feces, where he appears to have been denied cleaning supplies for a week or more.  See Grievance of Keith Lowe, ECF No. 86-8 at 4.  Whilst there, the grievances of plaintiff, Brandon Long, and Todd Boyes suggest that, despite their repeated grievances, the showers were not being cleaned in between uses.  See ECF No. 86-7, 86-8.  Plaintiff, as he claims, may have contracted COVID-19 through his use of the showers in Pod 6, which was at the time being used both as a disciplinary unit and a COVID isolation and quarantine unit.  And though plaintiff claims to have been symptomatic for COVID-19 and to have asked for tests "on a daily basis", he was not tested until March 2021.  See ECF No. 88-7, Keith Lowe Dep. Tr. at 33:14-16; 82:12-15.

In light of the above, the court finds that genuine issues of material fact exist as to whether the defendants were deliberately indifferent to the risk that plaintiff would contract COVID-19 when he was moved to Pod 6 for disciplinary reasons and, according to the plaintiff and other inmates, forced to share unclean showers with COVID-19-positive inmates, and, as to defendant Toney, denied access to COVID-19 testing when plaintiff claims he fell ill.  Plaintiff's then right to be free from such unnecessary exposure was clearly established.  By virtue of the genuine factual disputes as to those matters, the defendants are unable to show at this juncture that they are entitled to qualified immunity.

At the same time, genuine issues of material fact remain that preclude granting summary judgment in favor of plaintiff. First, the only evidence plaintiff has provided in support of the claim that he suffered from COVID-19 or from any symptoms of long COVID is his deposition testimony as to his symptoms. Second, while plaintiff has presented evidence by him and other inmates that the showers were not being cleaned between uses in accordance with prison policy, defendant Toney has testified, "to the best of my – if I remember correctly, [an inmate who tested positive for COVID-19] would either be first or last because that shower would have to be cleaned.  The showers were

cleaned." Toney Dep. Tr., ECF No. 88-6 at 40:9-16. Third, though plaintiff may have been exposed to COVID 19 by showering in an uncleaned shower after use by COVID-19-positive inmates such as Brandon Long, it is not clear from the record whether plaintiff was in fact exposed to any COVID-19-positive inmates. Finally, while defendant Toney has testified that the decision to test an inmate lies with "medical" and that he never instructed medical staff not to have an inmate tested, id. at 77:18-20, he has not testified that he did in fact inform medical staff of plaintiff's claimed daily requests for testing during the months of September and October 2020. It seems conceded that plaintiff did not receive a COVID-19 test until March 2021.

## III. CONCLUSION

Inasmuch as questions of fact remain as to whether either defendant is entitled to qualified immunity, defendants' motion for summary judgment, (ECF No. 88), is DENIED, and plaintiff's motion for summary judgment, (ECF No. 86), is also DENIED.

The Clerk is directed to transmit copies of this order to all counsel of record and any unrepresented parties.

Enter: November 19, 2025

John T. Copenhaver, Jr.
Senior United States District Judge